# Richmond

## MORGAN TAYLOR v. COMMONWEALTH OF VIRGINIA.

October 9, 1967.

Record Nos. 6547, 6548.

Present, Eggleston, C.J., Buchanan, Snead, I'Anson, Carrico and Gordon, JJ.*

*Montie S. Meeks* for plaintiff in error.

*D. Gardiner Tyler, Assistant Attorney General (Robert Y. Button, Attorney General, on brief), for defendant in error.*

SNEAD, J., delivered the opinion of the court.

On February 10, 1959, Morgan Taylor, defendant, was by a jury found guilty of murder in the first degree of his wife, Rena Taylor,

---

*Justice Spratley, prior to the effective date of his retirement, participated in the hearing and concurred in the disposition of these cases.

and of murder in the second degree of his sister-in-law, Lakie Babb. By agreement he was tried on both indictments in the same proceeding. In accordance with the verdicts, the trial court sentenced defendant to confinement in the State penitentiary for 20 years on each indictment. The order provided that the terms were to run consecutively. This delayed appeal resulted from a *habeas corpus* proceeding.

The facts concerning the tragedy are not in dispute. At approximately 9 a.m. on October 4, 1955, Morgan Taylor entered Estes Hardware Company in Coeburn and told Harley Counts, the clerk who had known Taylor since 1922, that he wanted to buy a pistol. They could not agree on the purchase price of it, and after some social conversation defendant left the store. A few moments later he appeared at the home of his sister-in-law, Lakie Babb, in Coeburn where his wife was staying. The Taylors had resided in Scott county, but due to marital difficulties Mrs. Taylor left the home about two weeks before. Mrs. Babb met Taylor in her yard and the two talked briefly, presumably about his wife returning home. Ella Babb, daughter of Lakie Babb, was sitting on the front steps but could not hear the conversation. However, she did hear defendant say as he was departing that "he would go get him a gun and he would come back." According to Ella, Mrs. Babb was not "upset" because "[h]is wife said he was just blowing, she didn't believe it."

Taylor returned to the hardware store and purchased a .22 calibre revolver and a box of shells after Counts, the clerk, agreed to give him an extra box. Counts asked him why he wanted the revolver. Taylor replied that "he was a pretty good shot" and was going to kill some squirrels.

Taylor then returned to the Babb home. According to Ella Babb, "[h]e just come to the front door. My mother [Lakie Babb] opened the door for him * * * [and] told him he wasn't going to start no disturbance." After stating that he would not start a disturbance, Taylor "grabbed" the pistol which was lodged under his belt. Ella jumped in front of her mother and was shot by defendant in the breast. Then he turned and shot Mrs. Babb "about the face." She died instantly and Ella was severely wounded.

Defendant then chased his wife through the Babb house and into the yard. While running and screaming she was carrying a two-month-old baby in her arms. After firing several shots defendant mortally wounded her. He then approached his wife, who had col-

lapsed, pointed the revolver at her head, snapped it several times, but it did not fire. Fortunately, the infant was not harmed. Taylor left the scene headed on the road toward Dungannon.

Taylor was apprehended and arrested by Bill Patterson, chief of police of Coeburn, a short distance from the scene of the crimes. He was found sitting on concrete steps of an old restaurant which had been partially razed by the State Highway Department. He was bleeding from a gash in his head sustained by a fall on the steps. A search of defendant's person revealed a "pint bottle" that was "broke all to pieces", a box of .22 long cartridges together with some loose ones and a large quantity of tablets. While in the patrol car he was seen eating an undetermined number of these tablets, which were described as white "just a size larger than aspirin tablets." The record does not disclose what they contained. Later, the revolver was found on top of the roof of the building.

Patterson drove Taylor to the Coeburn jail and from there he was transported by Sheriff Harold Fleming to the Wise county jail. On the next day, October 5, he was admitted in an unconscious condition to St. Mary's Hospital in Norton where he was treated by Dr. T. J. Tudor, Chief of Staff. An examination revealed an old wound on top of the head which had broken open. Dr. Tudor also discovered a "bruise on his shoulder and clavicle region, left side." While at the hospital Taylor ran a temperature as high as 104.5 degrees and would give but "few feeble, uncertain responsive answers" to questions.

On October 7, under the provisions of Code, § 19-202 (now § 19.1-228), upon motion of the Commonwealth's attorney, the Circuit Court of Wise County committed Taylor to the Southwestern State Hospital in Marion "for observation and report as to his mental condition, if possible, at the time of the commission of the said offense on October 4, 1955, and at the time of said examination and discharge from the said hospital."

In his forwarding report to the Superintendent of Southwestern State Hospital, dated October 7, 1955, Dr. Tudor stated, among other things, that "[w]e feel that there is blood stream infection, probably found in his head wound. Evidently much of his attitude is incident to the crime he has committed."

Subsequently, on October 21, 1955, defendant was indicted by the grand jury for the murders of Rena Taylor and Lakie Babb. He was also indicted for the attempted murder of Ella Babb.

On May 21, 1956, Judge George Morton of the Wise County

Circuit Court, was advised by Dr. Joseph R. Blalock, Superintendent, and Dr. R. G. Blackwelder, then Clinical Director, of Southwestern State Hospital, that defendant was "psychotically insane and has been psychotically insane since admission."

Thereafter, on August 1, 1956, all of the pending indictments against defendant were *nolle prossed.*

By letter dated, August 29, 1958, the court was advised:

"The above named patient was admitted in the criminally insane department on October 7, 1955, having been committed by this Court for observation report. On May 21, 1956, a report to the Court concerning his mental condition stated he was considered to be insane or psychotic. On August 24, 1958, in accordance with the Code of Virginia, Paragraph [section] 37-93, he was examined by a Commission of two State Hospital Superintendents, namely, Dr. James B. Powers [Pettis], Superintendent of Western State Hospital, Staunton, Virginia, and Joseph R. Blalock, Superintendent of Southwestern State Hospital, Marion, Virginia. It is the opinion of the Commission that he is now recovered and is able to stand trial."

As a result of this finding, defendant was on October 20, 1958, again indicted for the two murders and also the attempted murder. Two attorneys were appointed by the court to represent him on November 15, 1958, and defendant was returned to Wise county jail on November 17, 1958.

At the trial on the two indictments charging murder which commenced on February 9, 1959, defendant entered pleas of not guilty by reason of insanity.

In his assignments of error relied upon, defendant in substance makes these contentions: (1) that he was denied his right to counsel under the Sixth and Fourteenth Amendments to the Constitution of the United States when counsel was not appointed for him until three years, one month and ten days after the date of the alleged offenses; (2) that he was denied a speedy trial and the immediate appointment of counsel; (3) that Instruction No. I-1 was erroneous because it placed the burden on defendant to prove insanity; (4) that the court erred in permitting the jury to pass upon his mental condition on October 4, 1955, when the uncontradicted evidence of the Commonwealth showed that he was insane on October 7, 1955, and (5) that he was prejudiced by improper remarks made by the Commonwealth's attorney during his closing argument.

[1] Points (1) and (2) will be considered together. Defendant

argues that his constitutional rights were violated when he was not afforded counsel until more than three years after the date of the alleged offenses. He says that this delay denied him "the right to counsel at critical stages in his pretrial procedure", and the "preparation of the defense was postponed indefinitely until the state had completed its case."

In support of his position, defendant relies upon *Timmons* v. *Peyton*, 360 F. 2d 327. (Proceeding on petition for writ of *habeas corpus*.) On October 19, 1961, Timmons shot two women, killing one and seriously wounding the other. He then proceeded to have sexual intercourse with the one who was alive and perhaps the dead woman. The next day a confession was taken by the police. On October 25, Timmons was committed to the Southwestern State Hospital to determine whether he was competent to stand trial and also whether he was sane at the time of the commission of the offenses. On December 20 Dr. Blalock, Superintendent of the hospital, advised the court that Timmons was competent to stand trial. In an amended report dated December 27, Dr. Blalock stated that Timmons was sane at the time of the commission of the offense. On January 20, 1962, Timmons, on the advice of police, waived a preliminary hearing. Counsel was appointed for him on February 1, and on February 5, the grand jury returned an indictment for murder. Timmons was convicted of the offense by a jury in April, 1962.

In reversing the District Court, the Circuit Court of Appeals (4th Cir.) held, among other things, that Timmons "was denied due process by being delayed for over three and one-half months in the preparation of his defense while the state was actively seeking evidence to convict", and that "the cumulative effect of the state's conduct constituted a denial of the petitioner's Fourteenth Amendment right to due process and his Sixth Amendment right to counsel * * *."

The decision in that case does lend support to defendant's contention. However, the decision is not in accord with our views and is not controlling.

We granted Timmons a writ of error to the judgment of conviction and affirmed the judgment. *Timmons* v. *Commonwealth*, 204 Va. 205, 129 S.E. 2d 697. Subsequently, on May 23, 1963, Timmons filed a petition for a writ of *habeas corpus* against W. K. Cunningham, Jr., Superintendent of the Virginia State Penitentiary, in the Corporation Court of the City of Norfolk, Part Two. The writ was issued and after a plenary hearing it was dismissed by that court and

petitioner sought a writ of error from that judgment. Timmons assigned as error, among others, the refusal of the trial court to hold that the appointment of counsel to represent him three and one-half months after his arrest violated due process under the Fourteenth Amendment to the Constitution of the United States and Section 8 of the Constitution of Virginia. This Court denied the writ of error on October 17, 1963. Cert. den. 375 U.S. 994, 84 S.Ct. 635, 11 L. Ed. 2d 480.

At the time Taylor was committed then Code, § 19-202 (now § 19.1-228 with certain amendments) provided in part:

"When question of sanity raised, commitment before trial.—If, prior to the time for trial of any person charged with crime, either the court or attorney for the Commonwealth has reason to believe that such person is in such mental condition that his confinement in a hospital for the insane or a colony for the feebleminded is necessary for proper care and observation, the court or the judge thereof may, after hearing evidence on the subject, commit such person, if a white person, to any State hospital for the insane best adapted to meet the needs of the case and, if a colored person, to the Central State Hospital, under such limitations as it may order, pending the determination of his mental condition.* * *."

There was no requirement that counsel be appointed to represent defendant under a proceeding held pursuant to § 19-202. A commitment proceeding is not adversary in character. It is benevolent in concept and can only inure to the benefit of an accused. See *Caster v. United States*, 319 F. 2d 850, 852. When a person is committed under such procedure, it is not known whether he will ever be tried for the offense with which he is charged. Under the provisions of § 19-201 (now § 19.1-227) a person while insane cannot be tried for a criminal offense.

In the case at bar, soon after the authorities at Southwestern State Hospital reported that defendant was insane, the indictments against him were *nolle prossed.* He was not re-indicted until after he had been declared recovered and competent to stand trial. Counsel were appointed to defend him more than two and one-half months before trial. Taylor's only defense to the crimes charged was insanity and ample time was afforded counsel to prepare for trial.

We hold that under the facts and circumstances of this case the delay in the appointment of counsel for defendant did not violate any of his constitutional rights. Defendant's contention that he was

denied his constitutional right to a speedy trial is without merit. The delay was caused by his condition and not by the Commonwealth. As has been stated no trial could have been lawfully had until defendant had recovered and was able to stand trial. (§ 19.1-227). There was no unreasonable delay of the trial after this fact had been established.

[2] Defendant next contends that the court erred in giving Instruction No. I-1 because it placed the burden on the defendant to prove insanity. Defendant argues that it was only necessary for him to raise a reasonable doubt as to his sanity.

Instruction No. I-1 stated:

"The Court instructs the jury that the defendant is presumed to be sane and if the defense of insanity is relied upon, the burden is upon the defendant to show insanity at the time of the alleged offense to the satisfaction of the jury."

In Virginia, every man is presumed to be sane until the contrary is made to appear and when insanity is relied upon as a defense in a criminal prosecution, it must be proved by the defendant to the satisfaction of the jury. This does not shift the ultimate burden of proof which rests upon the Commonwealth to prove the commission of the alleged offense beyond a reasonable doubt.

This doctrine has long been the law in this State and has been followed in numerous decisions of this court. *Boswell* v. *Commonwealth*, 61 Va. (20 Gratt.) 860; *DeJarnette* v. *Commonwealth*, 75 Va. 867; *Wessells* v. *Commonwealth*, 164 Va. 664, 180 S.E. 419; *Maxwell* v. *Commonwealth*, 165 Va. 860, 183 S.E. 452; *Thompson* v. *Commonwealth*, 193 Va. 704, 70 S.E. 2d 284; *Christian* v. *Commonwealth*, 202 Va. 311, 117 S.E. 2d 72; *Jones* v. *Commonwealth*, 202 Va. 236, 117 S.E. 2d 67; and *Rollins* v. *Commonwealth*, 207 Va. 575, 151 S.E. 2d 622.

"'* * * When the *corpus delicti* has been established and proof adduced that the accused committed the act, it is not sufficient for the accused to raise a reasonable doubt as to his sanity; he must go one step further and prove to the satisfaction of the jury that he was insane at the time of the commission of the act." *Wessells* v. *Commonwealth*, *supra*, 164 Va. at 673, 180 S.E. at 422.

We find that the instruction correctly stated the law of this State and that the trial court did not err in granting it. Moreover, the record shows that counsel for defendant expressly stated during the trial that they had no objection to the instruction.

[3]   The defendant asserts that the trial court erred in permitting the jury to pass upon his mental condition on October 4, 1955, when the uncontradicted evidence of the Commonwealth showed that he was insane on October 7, 1955. Defendant argues that he was, as a matter of law, entitled to a presumption that he was insane on October 4, 1955, because Southwestern State reported him as being "psychotically insane" on October 7, 1955; that the *onus* was upon the Commonwealth to prove that he was sane on October 4, 1955, and that any presumption of sanity was rebutted by the Commonwealth's own evidence relating to his condition on October 7, 1955.

There was ample evidence adduced to support a finding that defendant was not insane on October 4, 1955, when the crimes were committed. Harley Counts, who sold Taylor the pistol and cartridges, saw him twice within an hour before the tragedy occurred. He testified that he had known Taylor since 1922; that Taylor appeared normal on both occasions he saw him; that he "looked like he always did. I couldn't tell any difference"; that his conversation was "normal", and that he could not detect anything "wrong with his mentality."

Orbin Estep, Taylor's brother-in-law, stated that he was with defendant a considerable time on the night before the tragedy; that Taylor "wanted me to see his wife and see if she would live with him again"; that he appeared normal; that Taylor "had some tablets with him" but he did not know what kind they were, and that Taylor was in his car on the morning of the murders and his condition was "[p]erfectly normal." In addition, several other witnesses who knew and saw Taylor on the morning of October 4, testified to the effect that he appeared and acted normally.

Dr. Tudor, who examined Taylor after he was admitted to St. Mary's Hospital on October 5, 1955, thought that he "was malingering because he killed two women." Dr. Charles A. Zeller, Clinical Director of Southwestern State, was the only expert in psychiatry to testify. He stated that he had examined Taylor and the hospital records and was of opinion that Taylor "planned his act, knew what he was doing and had knowledge of the type of crime he was committing." Dr. Zeller also said that when the crimes were committed defendant knew right from wrong. No witness expressed an opinion that Taylor was insane on October 4. We cannot say, as a matter of law, that Taylor was insane on October 4, and we hold that the trial court did

not err in submitting the question of his mental status on that date to the jury.

Finally, defendant claims that the court erred in permitting the Commonwealth's attorney to make improper and prejudicial remarks to the jury in his closing argument.

Counsel for defendant in his closing argument stated:

"* * * It is nothing to be ashamed of. It is something to be pitied because a man in this shape cannot help himself. We have to help them. But on the other hand, we don't want to turn him loose in society. We are not trying to do that. We are not trying to give you a cock and bull story. The law of Virginia is if you find him not guilty by reason of insanity the Judge will probably take it under his own motion to recommit him."

In response, the attorney for the Commonwealth made these remarks:

"* * * [H]e [the defense attorney] said, 'He will not go free', but I will say this to you gentlemen of the jury: turn this man loose and I have no choice except to let him go out that door as you go."

Counsel for defendant then interposed:

"I object to that statement. The law is if a man is adjudged insane it is your duty [that] he be recommitted."

There was no ruling by the court on the objection. Counsel for defendant did not insist that the court rule, nor did he request the court to instruct the jury to disregard the remarks of the Commonwealth's attorney. Moreover, counsel did not move for a mistrial. Hence, the objection was not saved for our consideration.

In addition, defendant complains of the following remarks made by the Commonwealth's attorney:

"* * * As I previously told you, the burden of proof that he shot is on the Commonwealth to prove beyond a reasonable doubt. Certainly we have done that. The burden is upon this defendant to prove he is insane and if there is a doubt in your mind it is your duty to convict him under the law. * * *"

The defendant claims that this argument was prejudicial to him and not a correct statement of the law of insanity as a defense in a criminal case. It informed the jury, defendant says, that unless he proved his insanity beyond a reasonable doubt, the jury must convict him. We do not agree. The remarks were substantially in accord with the principle of law contained in Instruction No. I-1.

Moreover, counsel made no objection and at the conclusion of argument one of defendant's attorneys stated to the court that he would like for the case to go to the jury.

The judgments appealed from are

*Affirmed.*