COURT OF APPEALS OF VIRGINIA

Present: Judges Annunziata, Lemons and Senior Judge Hodges
Argued at Alexandria, Virginia


EUGENE ALLEN BENNETT

                                              OPINION BY
v.   Record No. 1912-97-4         JUDGE ROSEMARIE ANNUNZIATA
                                            MARCH 9, 1999
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                     Richard B. Potter, Judge

          Raymond E. Patricco, Jr. (Jeffrey R. Gans;
          Steptoe & Johnson, on briefs), for appellant.

          Kathleen B. Martin, Assistant Attorney
          General (Mark L. Earley, Attorney General, on
          brief), for appellee.


     Eugene A. Bennett ("appellant") was convicted by jury trial

of the following offenses: abduction, use of a firearm in the

commission of abduction, statutory burglary, threatening to bomb

or burn a structure, possession of a firearm after having been

convicted of a felony, obtaining money or property by false

pretenses, attempted murder, possession of an explosive device,

and possession of explosive materials. On appeal, appellant

contends the trial court erred: 1) by refusing to grant a

mistrial after the Commonwealth elicited on direct examination

that a witness had taken a polygraph test, and 2) by refusing to

grant a mistrial after the Commonwealth in closing argument

compared the instant case to those of several infamous murderers.

We disagree and affirm.

FACTUAL BACKGROUND

Appellant and Marguerite Bennett married in 1984 while they both worked for the FBI in Atlanta, Georgia. The Bennetts had two daughters, who were ages ten and eight at the time of appellant's trial for the present offenses. While employed by the FBI, appellant frequently worked as an undercover agent.

In 1986, the Bennetts were transferred to a FBI office in Washington, D.C. The Bennetts began experiencing marital difficulties and separated in 1992. Subsequently, appellant initiated divorce proceedings, accusing Mrs. Bennett of desertion. In March 1993, appellant was indicted for an unrelated charge of fraud. Mrs. Bennett agreed to testify at appellant's trial, scheduled for June 1993. Appellant subsequently pled guilty to fraud and was incarcerated for twelve months. Upon his release in March 1995, appellant returned to Northern Virginia and resumed joint custody of his children with Mrs. Bennett. A hearing to determine final custody of the Bennetts' children and other issues regarding the Bennetts' divorce was scheduled for July 15, 1996.

On the night of June 23, 1996, appellant convinced Reverend Edwin Clever to meet with him alone at Clever's church under the false pretense of wanting to make an anonymous donation. When Clever arrived, appellant had already gained access to the locked building and abducted the minister at gunpoint, handcuffing his arms and legs together and placing a pouch containing explosives

around the minister's waist. Claiming that he was investigating a financing scam involving the church's bank accounts, appellant threatened to harm Clever's children unless he telephoned Mrs. Bennett and convinced her to come to the church that night. During the encounter with Clever, appellant appeared to be in contact with someone who was observing Clever's children.[1] Clever telephoned Mrs. Bennett at home and, following appellant's instructions, asked her to come to the church to assist him in handling a crisis that had arisen. Mrs. Bennett, a member and lay counselor of the church, agreed to meet him.

When Mrs. Bennett entered the church, she saw appellant, who was wearing dark clothing and a ski mask and was carrying a gun. Mrs. Bennett recognized her husband when he ran toward her saying, "Margo, don't fight me on this." Spraying him with pepper spray, Mrs. Bennett retreated into an office, pulled a gun from her purse, and hid behind a desk.

While in the office, appellant warned Mrs. Bennett that Clever had explosives around his waist and they would all die if she did not emerge from her hiding place and talk with him. Mrs. Bennett refused, fearing for her life. During the encounter, appellant repeatedly "bobbed around the corner" of the door, aiming his gun at Mrs. Bennett and taunting her to engage in a

---

[1]Mary Ann Khalifeh, appellant's unwitting associate, had placed Clever's house under surveillance that night. Khalifeh answered a newspaper advertisement placed by appellant in February 1996 to be trained as a private investigator. At the time of the offense, Khalifeh knew appellant as "Edwin Adams" and believed they were working on an insurance fraud case.

- 3 -

shootout. At one point, appellant told Mrs. Bennett he was going to take the couple's children and leave the country. Eventually, Mrs. Bennett was able to call 911 from the office, and appellant fled the church.

At trial, appellant presented a M'Naghten Rule insanity defense, calling two expert witnesses to establish his mental state at the time he committed the above-mentioned acts. The first witness, Dr. Michael Girodo, offered no testimony regarding appellant's mental health. Instead, Dr. Girodo, a professor of psychology, testified concerning his research on the psychiatric effects of undercover operations on law enforcement officers.

Appellant's second expert, Dr. Robert Bishop, a psychiatrist, examined appellant for three and one-half hours and concluded he suffered from a dissociative disorder at the time of the present offenses. Bishop opined that, as a result of this disorder, appellant "did not appreciate the nature and character of his acts at the time of the offense" and did not understand right from wrong. He did not testify appellant's mental defect caused him to act under an irresistible impulse. Although Dr. Bishop considered the possibility Bennett was malingering, he concluded appellant's condition was genuine.

In rebuttal, the Commonwealth presented the expert opinions of two witnesses, Dr. Stanton Samenow and Dr. Evan Stuart Nelson, both of whom are psychologists. Dr. Nelson's testimony was limited to a discussion of the nature of dissociative disorders; he offered no opinion with respect to appellant's mental state at

the time of the offenses.  Dr. Samenow, after examining appellant for eight hours, concluded appellant was legally sane at the time of the present offenses.  Dr. Samenow found nothing to indicate that appellant suffered from a dissociative disorder and opined appellant was malingering.

During its case-in-chief, the Commonwealth also introduced the testimony of appellant's wife.  Mrs. Bennett testified extensively concerning the present offenses.  Mrs. Bennett also testified to a previous, unrelated incident in which appellant abducted her in a manner resembling his conduct in committing the present offenses.  Mrs. Bennett testified that, in 1993, appellant lured her into meeting with him under false pretenses, subdued her with a stun gun, and tied her up.  Appellant represented to Mrs. Bennett that an associate had custody of their children and that the children would die if she testified against him at his trial for the pending charge of fraud.  Under this threat, appellant kept Mrs. Bennett as a virtual prisoner for several days until the scheduled trial of the fraud charge began.

When Mrs. Bennett perjured herself at the fraud trial, the judge interrupted the proceeding.  Mrs. Bennett confessed the circumstances of her abduction to her attorney soon thereafter.

At the trial of the present case, and in conjunction with Mrs. Bennett's testimony describing her abduction in 1993, the Commonwealth asked her the following questions:

Q. And did your attorneys convince you to call the Department of Justice [following your abduction] at least to cooperate with them?
A. Yes.
Q. And did you, in fact, do so?
A. Yes, I did.
Q. And prior to your testimony, did your attorneys have you run under a polygraph?
A. Yes.

Appellant immediately objected. In response, the court stated in open court, "I sustain the objection." Moments later, appellant's counsel asked to approach the bench and moved the court for a mistrial on the basis of the Commonwealth's question concerning Mrs. Bennett's polygraph. The court denied appellant's motion.

At the close of the Commonwealth's direct examination, appellant's counsel asked the court to recess, stating:

I would like to attempt to reach a stipulation with the Commonwealth; and hopefully we will be heard by the Court in reference to the previous objection [to the Commonwealth's reference to the polygraph examination].

The court agreed. Upon readjournment, the court had the following dialogue with appellant's counsel:

THE COURT: Are there any motions or stipulations that should be taken up before the jury comes in?
[COUNSEL]: We're prepared to proceed, Your Honor.
THE COURT: No motions; no stipulations; you don't seek any instructions?
[COUNSEL]: No, Your Honor.

Counsel later explained that he declined to ask for a contemporaneous cautionary instruction regarding polygraph

evidence because he did not want to draw further attention to Mrs. Bennett's improper testimony.

Throughout the trial, appellant denied abducting his wife in 1993 and maintained their contact prior to her perjury was consensual. To this end, appellant's counsel attempted, on cross-examination of Mrs. Bennett, to prove appellant did not hold her against her will, eliciting the fact that she had engaged in sexual intercourse with appellant on two occasions during the time of the alleged abduction.

At the close of the evidence, the court instructed the jury that the results of polygraph examinations are not admissible and that it could not consider any reference to the willingness or unwillingness of any witness to take such a test. The court also instructed the jury that it "must not consider any matter that was rejected or stricken by the Court," stating "[i]t is not evidence and should be discarded." Finally, the court instructed the jury that it must find appellant not guilty if it determined he was insane under either the M'Naghten Rule or the irresistible impulse doctrine. The court specifically instructed the jury "that if the act which is alleged to be the result of an irresistible impulse was planned in advance, then, as a matter of law, such act cannot be said to be the product of an irresistible impulse."

## II.

### ALLEGED PREJUDICE FROM THE ADMISSION OF POLYGRAPH EVIDENCE

Appellant first contends Mrs. Bennett's testimony that she took a polygraph test following her alleged abduction by appellant in 1993 irreparably prejudiced his defense. Appellant further contends the court's jury instruction to disregard polygraph evidence did not sufficiently mitigate the prejudice. Although we find Mrs. Bennett's reference to her polygraph was improper, we disagree appellant's defense was prejudiced as a result.

Because a polygraph examination has no proper evidentiary use, neither the results of a polygraph, Robinson v. Commonwealth, 231 Va. 142, 155, 341 S.E.2d 159, 167 (1986), nor "[e]vidence of a person's willingness or unwillingness to submit to a polygraph" is admissible in court. Gray v. Graham, 231 Va. 1, 10, 341 S.E.2d 153, 157 (1986). See Pugliese v. Commonwealth, 16 Va. App. 82, 89, 428 S.E.2d 16, 22 (1993); Crumpton v. Commonwealth, 9 Va. App. 131, 135, 384 S.E.2d 339, 342 (1989). Furthermore, evidence concerning a polygraph is not admissible to establish the guilt or innocence of an accused or to impeach a witness' credibility. Robinson, 231 Va. at 155-56, 341 S.E.2d at 167.

> In a long line of cases, spanning almost thirty years, [the Supreme Court of Virginia has] made clear that polygraph examinations are so thoroughly unreliable as to be of no proper evidentiary use whether they favor the accused, implicate the accused, or are agreed to by both parties. The point of these cases

> is that the lie-detector or polygraph has an aura of authority while being wholly unreliable.

Id. at 156, 341 S.E.2d at 167 (citations omitted) (emphasis added). "The mention of polygraphs in the presence of the jury impermissibly suggests that there is a scientific way to find the truth where in reality, in our system of justice, the jury decides what is true and what is not." Id.

In this case, the Commonwealth improperly referred to the fact that Mrs. Bennett took a polygraph examination after her 1993 abduction. Mrs. Bennett testified on direct examination that her attorneys "ha[d her] run under a polygraph" prior to cooperating with the Department of Justice in appellant's unrelated prosecution for fraud. Although Mrs. Bennett's statement expressly revealed neither the results of her polygraph nor her willingness or unwillingness to take the polygraph, the fact she took a polygraph prior to assisting authorities who were prosecuting her husband for fraud suggested that her testimony concerning the 1993 abduction had been scientifically corroborated. In closing argument, the Commonwealth used Mrs. Bennett's testimony regarding her prior abduction to argue appellant was sane when committing the present offenses.[2] Mrs.

_____

[2]The Commonwealth argued in pertinent part:

> This case is about whether on the one hand the defendant has a criminal mind. One that is capable of planning, executing, organization and step by step action.

Or whether on the other hand he has gone so far over the line and become criminally insane.

   *     *     *     *     *     *     *

[The judge] has instructed you on the law of insanity. . . .

   *     *     *     *     *     *     *

[So w]hat do[es appellant] have to prove to you?  One of two things.
First that he was so diseased that he didn't appreciate the consequences of what he was doing or was unable to tell right from wrong.  In other words he didn't know what was going on around him.
Or two, if he knew what he was doing, that he had as a result of his disease an impulse that he could not resist that forced him to commit these acts.
But the law says if you find that the acts were planned, then you may not consider irresistible impulse.
All these acts clearly were planned.
So irresistible impulse we get rid of right from the beginning.  I would not[e] incidentally that Dr. Bishop never said one word about irresistible impulse.  Not one.
So the only question we have left is whether the defendant knew what he was doing.  Was he cognizant of it or was he off in some world somewhere where he had no idea what was going on.

 *     *     *     *     *     *     *

And the abduction of the minister and the abduction of Mrs. Bennett, twice, once in '96, once in '93 . . . all bears some striking similarities.
Because you see, folks, when he went into that church and tied up the reverend this wasn't the first time he had done that kind of thing.
When he told the reverend that someone was watching his kids, it wasn't the first time he had gained control over someone through that ruse.

- 10 -

Bennett's testimony was therefore probative as to appellant's insanity defense and, by extension, his guilt or innocence. Moreover, as appellant denied abducting his wife in 1993 and introduced evidence that their contact was consensual, Mrs. Bennett's credibility was at issue. Thus, we find the Commonwealth improperly used Mrs. Bennett's polygraph examination to suggest that appellant's guilt and Mrs. Bennett's credibility had been scientifically established.

Notwithstanding the impropriety of Mrs. Bennett's reference to taking a polygraph examination, we find the trial court did not err in denying the appellant's motion for a mistrial.

"A trial court exercises its discretion when it determines whether it should grant a motion for a mistrial. Whether improper evidence is so prejudicial as to require a mistrial is a question of fact to be resolved by the trial court in each particular case." Beavers v. Commonwealth, 245 Va. 268, 280, 427 S.E.2d 411, 420 (1993), cert. denied, 510 U.S. 859 (1993). "Thus, a trial court's denial of a motion for a mistrial will not

---

He did it to Mrs. Bennett in '93. Bound her. Got the jump on her just like he did the minister. Bound her. Blind folded her. Held her and told her there's somebody with the kids.
Isn't that what he did to the minister. . . .

\*      \*      \*      \*      \*      \*      \*

Planning, contingencies. Always a backup plan. . . . He did the same thing with Margo Bennett in '93 that he did to Margo Bennett and the minister in '96.

- 11 -

be reversed on appeal unless there exists a manifest probability as a matter of law that the improper evidence prejudiced the accused."  Mills v. Commonwealth, 24 Va. App. 415, 420, 482 S.E.2d 860, 862 (1997).

Following the improper admission of evidence, juries are presumed to follow a court's "prompt, explicit, and curative instructions" to disregard the evidence.  Beavers, 245 Va. at 280, 427 S.E.2d at 420; Spencer v. Commonwealth, 240 Va. 78, 95, 393 S.E.2d 609, 619 (1990) (stating that juries are always presumed to follow "an explicit cautionary instruction promptly given, unless the record clearly shows that the jury disregarded it").  As an exception to this rule, "'the admission of incompetent evidence is reversible error notwithstanding the fact that the trial court, after its admission, instructed the jury to disregard it, if such illegal evidence was so impressive that it probably remained on the minds of the jury and influenced their verdict.'"  Mills, 24 Va. App. at 420, 482 S.E.2d at 862 (quoting Asbury v. Commonwealth, 211 Va. 101, 106, 175 S.E.2d 239, 241 (1970)).

Given the aforementioned principles, in order for appellant to prevail we must find a manifest probability that the admission of Mrs. Bennett's testimony that she took a polygraph so impressed the jury that it remained on their minds and influenced their verdict, notwithstanding the court's instruction to disregard at the close of evidence.  See id. at 420-21, 482 S.E.2d at 862-63.  The circumstances of this case do not support

such a finding.

A reviewing court may consider a number of factors in determining whether a mistrial motion was improperly denied. "Whether a manifest probability exists that . . . improper evidence prejudiced the accused despite [a court's] cautionary instruction depends upon the nature of the incompetent evidence when considered in relation to the nature of the charges, the other evidence in the case, and [the] manner in which the prejudicial evidence was presented." Id. Additionally, a court's failure to take any action in response to an improper question is relevant to determining prejudice because the jury may infer from such inaction that the court approved of the impropriety. Lewis v. Commonwealth, 211 Va. 80, 84, 175 S.E.2d 236, 238 (1970) (finding the defendant suffered no prejudice from the improper admission of testimony and a statement by the prosecutor where the court expressly disapproved of the improper remarks with a cautionary instruction). See Ward v. Commonwealth, 205 Va. 564, 573-74, 138 S.E.2d 293, 300 (1964); Manning v. Commonwealth, 2 Va. App. 352, 356-57, 344 S.E.2d 197, 199 (1986). The number of references to an error is also relevant to our consideration of whether prejudice influenced the jury. Ward, 205 Va. at 574, 138 S.E.2d at 300 ("In this instance, the first error was compounded by the second and it would be hard to blot the information from the minds of a jury.").

In this case, it is clear the Commonwealth purposely elicited evidence that Mrs. Bennett took a polygraph. However, appellant promptly objected to this error. In response, the trial court immediately sustained the objection. After asking for a recess in order to decide how to deal with the improper testimony, appellant's counsel declined to request a contemporaneous cautionary instruction, explaining that he did not want to draw further attention to the impropriety. Deferring to counsel, the court, in its discretion, also declined to give a cautionary instruction sua sponte. See Manetta v. Commonwealth, 231 Va. 123, 127 n.2, 340 S.E.2d 828, 830 n.2 (1986) (stating that a trial court is not required to give a cautionary instruction sua sponte if not requested to do so by a party and recognizing that such instructions may sometimes serve to emphasize portions of testimony which the complaining party would prefer to avoid). Instead, appellant moved the court, at the conclusion of the evidence, to instruct the jury to disregard any evidence regarding the results of a polygraph or a witness' willingness to take a polygraph. The court instructed the jury accordingly, further instructing that the jury should not consider any evidence rejected or stricken by the court. From these facts, it cannot be contended the court countenanced the impropriety. On the contrary, the court expressly disapproved of the Commonwealth's improper question by sustaining appellant's objection and subsequently instructing the jury to disregard any evidence concerning the results of a polygraph or Mrs. Bennett's

- 14 -

willingness to take a polygraph.  Without any evidence in the record to the contrary, we presume the jury followed the court's instructions.

Further, given the manner in which the Commonwealth presented the incompetent evidence at trial, we do not find the error here to be so impressive that it likely influenced the jury's verdict despite the court's curative instructions.  At the close of its lengthy direct examination, the Commonwealth asked Mrs. Bennett whether her attorneys required her to take a polygraph examination before assisting the Department of Justice prosecution of appellant for an unrelated charge of fraud. Without elaboration, Mrs. Bennett responded in the affirmative. The Commonwealth made no other reference to Mrs. Bennett's polygraph during trial and did not mention the polygraph in its opening statement or closing argument.  Thus, in the context of appellant's entire trial, which occurred over a period of more than two weeks, the Commonwealth's error consisted of a single question and answer.  See LeVasseur v. Commonwealth, 225 Va. 564, 589, 304 S.E.2d 644, 658 (1983) (finding that a single improper question on direct examination, when viewed in the context of the entire examination, did not cause such impressive prejudice that the court's cautionary instruction could not cure the impropriety).

The nature of the incompetent evidence in relation to the critical issues at appellant's trial also militates against a finding of prejudice requiring reversal.  Mrs. Bennett's

testimony that she took a polygraph after perjuring herself in 1993 is distinguished by what it fails to state; it neither indicates the polygraph's results nor Mrs. Bennett's willingness to take a lie detector test. As noted earlier, appellant objected before the Commonwealth could elicit further elaboration or clarification. Thus, the relevance of the reference to the polygraph is unclear. Although the jury might arguably have inferred that the results of Mrs. Bennett's polygraph were favorable to the Commonwealth's case, the context of the inquiry and the ambiguity of her answer make it unclear whether the polygraph results related to Mrs. Bennett's testimony concerning appellant's fraud or to the events surrounding her abduction by appellant in 1993; only the latter had an arguable impact in the present case. Such ambiguities in improper polygraph testimony have generally been held to support the conclusion that an error in the admission of such evidence was harmless. See Epperly, 224 Va. at 234, 294 S.E.2d at 893-94 (holding that a witness' mention of the word "polygraph" did not cause harmful error because the reference was elicited "without definition or elaboration"); Barber, 206 Va. at 250-51, 142 S.E.2d at 491-92 (finding that a witness' reference to whether the defendant would take a polygraph was error and considering the fact that the improper testimony did not show the defendant's unwillingness to take a polygraph as a mitigating circumstance on the issue of prejudice).

We also find the improper reference to Mrs. Bennett's

- 16 -

polygraph constituted relatively weak evidence in rebuttal of appellant's insanity defense.  Virginia law recognizes two tests by which an accused can establish criminal insanity, the M'Naghten Rule and the irresistible impulse doctrine.  The irresistible impulse defense is available when "the accused's mind has become 'so impaired by disease that he is totally deprived of the mental power to control or restrain his act.'" Godley v. Commonwealth, 2 Va. App. 249, 251, 343 S.E.2d 368, 370 (1986) (quoting Thompson v. Commonwealth, 193 Va. 704, 716, 70 S.E.2d 284, 292 (1952)).  Under the M'Naghten Rule, an accused is insane if he or she did not understand the nature, character, and consequences of his or her act, or was unable to distinguish right from wrong.  Price v. Commonwealth, 228 Va. 452, 457, 323 S.E.2d 106, 109 (1984).

Evidence that an accused planned his or her criminal acts precludes, as a matter of law, any finding that the accused acted under an irresistible impulse.  Rollins v. Commonwealth, 207 Va. 575, 580, 151 S.E.2d 622, 625 (1966).  Evidence of planning does not, however, preclude a finding of insanity under the M'Naghten Rule.  See Johnson v. Insurance Co. of North America, 232 Va. 340, 341, 347-48, 350 S.E.2d 616, 617, 621 (1986) (explaining the defendant may be criminally insane under the M'Naghten Rule, even though he acted deliberately, methodically, and intentionally, planning to kill his victim without knowing that it was wrong).

Here, the Commonwealth used Mrs. Bennett's testimony regarding her abduction in 1993 to argue that appellant planned

the present offenses.  The improper evidence of Mrs. Bennett's polygraph was intended to corroborate this testimony.  While such evidence, in the abstract, is arguably prejudicial to a case in which the defendant contends he or she acted under an irresistible impulse, in this case, appellant presented no evidence in support of an irresistible impulse defense.[3] Appellant's evidence was limited to establishing his insanity under the M'Naghten Rule.  It follows that appellant was not prejudiced in establishing a defense for which he presented no evidence.[4]  We find the Commonwealth's improper polygraph evidence, admitted to show appellant planned the present offenses, did not prejudice appellant's claim of insanity under the M'Naghten Rule because the evidence had no relevance under the M'Naghten test of insanity.

For the reasons stated above, we find no manifest probability as a matter of law that the improper polygraph

---

[3]Appellant's expert, Dr. Bishop, testified appellant "did not appreciate the nature and character of his acts at the time of the offense[s]" and did not understand right from wrong.  We find no indication in the record that appellant offered any evidence on the issue of his insanity under the irresistible impulse doctrine.

[4]We note that the trial court gave an instruction on the irresistible impulse test for insanity.  We further note that the Commonwealth referred to the irresistible impulse defense in closing argument.  However, as our review of the record makes manifest, appellant presented no evidence in support of irresistible impulse.  In the absence of such evidence, the jury could not properly find that appellant acted as a result of an irresistible impulse.  Indeed, as the jury found appellant guilty, it properly did not make such a finding.  The testimony of Mrs. Bennett clearly had no probative value and, logically, no prejudicial impact on this issue.

evidence prejudiced the jury, and we affirm the trial court's denial of appellant's motion for a mistrial.

## III.

### ALLEGED IMPROPRIETY OF COMMONWEALTH'S CLOSING ARGUMENT

Appellant next contends the Commonwealth's closing argument reference to infamous murderers warrants reversal of his convictions. The Commonwealth argues the trial court properly denied appellant's motion for a mistrial because appellant failed to move for a mistrial or request a cautionary instruction in a timely fashion, improperly waiting until the end of the prosecutor's argument. We agree with the Commonwealth.

### A. Factual Background

As previously noted, Dr. Bishop testified that he believed appellant suffered from a form of dissociative disorder and, therefore, did not understand the nature of his criminal actions. Upon the Commonwealth's cross-examination, Dr. Bishop acknowledged that many criminals with severe mental illnesses would not meet the test for criminal insanity. Dr. Bishop agreed Charles Manson was an example of such a person. When the Commonwealth further asked whether Jeffrey Dahmer would also exemplify such a person, appellant objected on the ground that Dr. Bishop was not qualified to answer. The court overruled the objection, stating "[i]t goes to his expertise. If he can answer the question, I'll let him answer the question." Dr. Bishop then testified he believed Jeffrey Dahmer "probably was" insane, even though the jury in Dahmer's trial found otherwise.

- 19 -

During closing argument, the prosecutor attempted to explain the legal defense of insanity only becomes available when a defendant, no matter how ill, demonstrates he has "cross[ed]" a "bright line."  He argued the only relevant test for determining appellant's sanity was whether appellant "knew what he was doing."

Elaborating on this point, the Commonwealth argued, "You can put on this side of the insanity line (indicating) everybody in this courtroom including the defendant.  People with psychiatric problems, mental problems, infamous criminals, Charles Manson, Richard Speck, the man who murdered eight student nurses.  Jeffrey Dahmer.  The murder and cannibalization --"

When defense counsel objected to the Commonwealth's argument, the court asked the prosecutor, "[h]ow far are you going with this?"  When assured he would go no further, the court stated that it would "[o]verrule the objection at this time."  Continuing his argument, the Commonwealth stated, "Th[ese] men knew what they were doing.  W[ere] their actions bizarre?  Was it evil?  Was it macabre?  Did it shock your conscious [sic] when you heard about it?  Of course.  No different than what he did.  Not even as bad.  If they are legally responsible so is this man."

Appellant's counsel made no further objection but moved for a mistrial at the close of the Commonwealth's argument, citing the references to Charles Manson, Richard Speck, and Jeffrey Dahmer.  The court denied the motion.

## B.  Legal Principles

An alleged error is sufficiently preserved for consideration on appeal if "at the time the ruling or order of the court is made or sought, [a party] makes known to the court the action which he desires the court to take or his objections to the action of the court and his grounds therefor."  Code § 8.01-384. The purpose of this rule is "to avoid unnecessary appeals, reversals and mistrials by allowing the trial judge to intelligently consider an issue and, if necessary, to take corrective action."  Campbell v. Commonwealth, 12 Va. App. 476, 480, 405 S.E.2d 1, 2 (1991).

When allegedly improper comments are made during closing argument in the guilt phase of a trial, the objecting party must expressly seek the action that it desires the judge to take. Craddock v. Commonwealth, 16 Va. App. 402, 405, 429 S.E.2d 889, 891 (1993).  "It is well settled that errors assigned because of a prosecutor's alleged improper comments or conduct during argument will not be considered on appeal unless an accused timely moves for a cautionary instruction or for a mistrial." Cheng v. Commonwealth, 240 Va. 26, 38, 393 S.E.2d 599, 605-06 (1990).  See Taylor v. Commonwealth, 208 Va. 316, 324, 157 S.E.2d 185, 191 (1967).  "A timely motion for a mistrial or a cautionary instruction is required to preserve the issue for appeal even if an objection was properly made to the conduct or comments and improperly overruled by the trial judge."  Morris v. Commonwealth, 14 Va. App. 283, 287, 416 S.E.2d 462, 464 (1992)

- 21 -

(en banc).  "The recognized purpose of this requirement is to prevent retrials by calling error to the attention of the trial judge, who may then caution the jury to disregard the inappropriate remarks."  Craddock, 16 Va. App. at 405, 429 S.E.2d at 891.  See Mack v. Commonwealth, 20 Va. App. 5, 8, 454 S.E.2d 750, 751 (1995).

"Making a timely motion for mistrial means making the motion 'when the objectionable words were spoken.'"  Yeatts v. Commonwealth, 242 Va. 121, 137, 410 S.E.2d 254, 264 (1991) (quoting Reid v. Baumgardner, 217 Va. 769, 774, 232 S.E.2d 778, 781 (1977)).  "If counsel believes that an argument requires or justifies a mistrial, he has the duty to move promptly before conclusion of the argument so that the trial court may determine what corrective action, if any, should be taken."  Pullen v. Nickens, 226 Va. 342, 346-47, 310 S.E.2d 452, 454-55 (1983).  See Beavers, 245 Va. at 278-79, 427 S.E.2d at 419 (holding that a complainant's failure to object and move for a mistrial until the conclusion of an opening statement constituted a waiver of its arguments on appeal).  There appears to be no exception in Virginia law to the strict application of this rule.

Although appellant objected to the Commonwealth's comparison of him with several infamous murderers, he withheld his motion for mistrial until after the Commonwealth completed its closing argument.  Appellant thus failed to preserve for appeal his objection to the Commonwealth's argument.  We express no opinion on whether the Commonwealth's argument was, in fact, improper.

- 22 -

Under Virginia law, appellant was required to timely move for a mistrial in order to preserve his objection.  Having failed to do so, the objection to the Commonwealth's comments was waived.

Based on the foregoing, we find no error in the trial court's denial of appellant's motion for a mistrial. Accordingly, we affirm appellant's convictions.

<u>Affirmed.</u>