COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Lorish and Frucci

DONTARIO TOBIAS GOODMAN

v.    Record No. 0878-24-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION*
PER CURIAM
SEPTEMBER 30, 2025

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Robert G. MacDonald, Judge

(Katherine D. Currin; Morris, Crawford & Currin, P.C., on brief), for
appellant.

(Jason S. Miyares, Attorney General; Liam A. Curry, Assistant
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of the City of Chesapeake convicted Dontario

Tobias Goodman of forcible sodomy and sentenced him to 40 years of imprisonment with 20 years

suspended.[1]  On appeal, Goodman argues that the circuit court erred in denying his motion for a

mistrial.  He also challenges the sufficiency of the evidence to sustain his conviction.  For the

following reasons, we affirm the conviction.[2]

BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the

sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The jury acquitted Goodman of robbery, abduction, and three counts of using a firearm
in the commission of a felony.

[2] After examining the briefs and record in this case, the panel unanimously holds that oral
argument is unnecessary because "the appeal is wholly without merit."  Code § 17.1-403(ii)(a);
Rule 5A:27(a).

Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

I.  Evidence at Trial

On November 6, 2021, K.P.[3] and her boyfriend moved some of her belongings from the home they shared to a storage unit she had rented in Chesapeake. She also moved some items from a smaller storage unit into a larger one. K.P. and her boyfriend were ending their relationship, and she did not intend to live in the home with him any longer.

With her car fully packed, K.P. returned to the storage facility alone at about 6:45 p.m. Around 8:30 p.m., as K.P. was turning out the light and closing the door to the smaller storage unit to leave, K.P. was accosted by two men. One of the men shoved her in the right shoulder into the unit. She heard someone say that he had a gun. One of the men ordered her to unfold a futon and sit on it; K.P. complied.

One of the men sorted through some of K.P.'s belongings and asked her "random" questions as the other man, holding a gun, stood in front of K.P. Meanwhile, the men spoke to each other in a language K.P. did not understand. Both had small flashlights and wore gloves. They broke into a locked bag and found a vibrator. The man in front of K.P. asked if she wanted to have sex, and she said no. He removed his penis from his pants and pressed it against K.P.'s lips and face. He forced K.P.'s mouth open with his penis and ordered her to suck it. K.P. tried to remove the penis from her mouth, but she could not. Because the man had a gun, K.P.

---

[3] We use initials, rather than names, to protect the privacy of the victim.

believed she could not fight him. Eventually, the man ejaculated on K.P.'s mouth, face, and shirt.

After a few minutes, the men left. They took K.P.'s wallet, car keys, cell phone, computer tablet, and three duffel bags full of K.P.'s property. One of the men moved K.P.'s vehicle close to the door of the storage unit. They closed the door to the unit and locked K.P. inside.

K.P. screamed for help until she lost her voice. She rummaged through the remaining boxes in the unit but found nothing to help her. Believing she would be confined to the storage unit for a while, she rearranged some belongings for her comfort. When she went through the boxes a second time, she found an old cell phone. K.P. used the phone to call 911.

Following the 911 call, the police arrived at the facility after 6:00 a.m. on November 7, 2021, scaled the fence, unbolted the door to K.P.'s storage unit, and opened it to release K.P. K.P. was distraught and crying. K.P. said that a man had taken items from her by force and sexually assaulted her. She later said that the man had forced her to suck his penis. K.P. could not identify the man who assaulted her because the storage unit was dark. At trial, K.P. said that the assailant wore a black hoodie, mask, pants and shoes, and the skin around his eyes was a light brown color.[4] The police collected a pair of red sweatpants in a clear bag that K.P. said she was wearing during the attack. K.P. said that she believed some of the attacker's semen may have dropped onto the pants. At trial, K.P. said she did not remember taking off the pants and putting them in the bag.[5]

---

[4] When questioned by the police, K.P. said she was unable to see the clothing of the two assailants, but the man who assaulted her wore high-top shoes with "Fila" on them.

[5] K.P. admitted having convictions for felonies and misdemeanors of moral turpitude. She also said the convictions were more than 20 years old. K.P. denied that she had been living in the storage unit, as defense counsel implied.

The police transported K.P. to a medical facility for a SANE examination. The police turned over the pants to Julianne Costello, the nurse examiner. Costello collected evidence swabs from K.P.'s face, mouth, dentures, and hand. The pants were returned to the police after the examination. Believing that K.P.'s physical evidence recovery kit (PERK) would be the "best evidence," the police submitted it to the Department of Forensic Science (DFS) for analysis before sending any other evidence for testing.[6]

Laboratory analysis revealed spermatozoa in the swabs collected from K.P.'s lips and dentures. DNA mixtures in the samples were attributable to K.P. and to another person. Comparison to the Virginia DNA data bank showed that the foreign sample was consistent with Goodman's DNA. Because DNA evidence had been obtained in K.P.'s PERK, the police did not later submit the pants for analysis.

The police questioned Goodman on March 20, 2022, after receiving the initial DNA results. He denied knowing K.P. or having sex with women of her age and claimed he had never been to the storage facility where the incident occurred. The police obtained a buccal swab from Goodman.

The police resubmitted K.P.'s PERK to the laboratory with Goodman's buccal swab. Amy Jo Townley, a forensic scientist for DFS, analyzed the DNA from K.P.'s PERK and Goodman's buccal swab. Townley was unable to eliminate Goodman as the contributor to the foreign DNA profile found on K.P.'s lips and dentures. Townley testified that the probability of randomly selecting an unrelated individual with a DNA profile matching the DNA from K.P.'s mouth was greater than 1 in 7.2 billion. Townley explained this was the entire world population, so "if I were to perform DNA analysis on everyone in the world . . . I would expect to find that

---

[6] The police officer who seized the pants testified that they were not submitted to the laboratory for testing.

profile once." Townley confirmed that there was no evidence of anyone else's DNA in the sample taken.

In his defense, a probation officer who supervised Goodman testified that she arranged a meeting for him with a Chesapeake detective to discuss the incident involving K.P. The probation officer spoke with Goodman after that meeting. Goodman said that he had not told the detective that he paid five dollars to a prostitute for oral sex on a side street in Portsmouth. He said the prostitute appeared to be older than in "her 30s," as she claimed.

City of Chesapeake Sergeant Nicole Kath testified that when she arrived at the storage unit on the morning of November 7, 2021, the arrangement of items inside it led her to believe that K.P. was living there.

II. Motion for Mistrial

In response to the prosecutor's questions on direct examination, Townley confirmed that DFS is an independent crime laboratory and available to testify and consult either the Commonwealth or the defense in criminal cases. The prosecutor asked if the laboratory was "available to do any testing or examinations for defense counsel." Townley responded, "It's my understanding that we can only accept evidence from law enforcement or the medical examiner, but that defense attorneys are able to petition the Court to have something analyzed, and then the Court will order us to do it."

Goodman objected and moved for a mistrial. Goodman argued that Townley's response indicated that he had the opportunity to have evidence tested and thus shifted the burden of proof about whether he was required to produce evidence. He maintained that in light of Townley's response, the jury was left to speculate about what the defense could have done to prove his theory of the case, specifically through scientific testing of the pants K.P. wore at the time of the incident. The Commonwealth disagreed, stating that the question and Townley's answer showed

only that the findings of the laboratory were neutral and in no way shifted the burden of proof to Goodman.

The circuit court found that there had been no prejudicial comment by the Commonwealth, or statement of a witness, that the defendant had any duty to produce evidence. The circuit court found no grounds for a mistrial, noting its initial instructions to the jury that the defendant was not required to present any evidence. Defense counsel then maintained that an instruction to the jury could not cure the situation. The circuit court gave a curative instruction, nonetheless, reminding the jury "that there is no burden on the defendant to produce any evidence whatsoever." All of the jurors indicated that they understood the circuit court's instruction that the defendant was not required to produce evidence.

## ANALYSIS

### I. Mistrial

"Whether improper evidence is so prejudicial as to require a mistrial is a question of fact to be resolved by the trial court in each particular case." *Bennett v. Commonwealth*, 29 Va. App. 261, 273 (1999) (quoting *Beavers v. Commonwealth*, 245 Va. 268, 280 (1993)). "Thus, a trial court's denial of a motion for a mistrial will not be reversed on appeal unless there exists a manifest probability as a matter of law that the improper evidence prejudiced the accused." *Id.* at 273-74 (quoting *Mills v. Commonwealth*, 24 Va. App. 415, 420 (1997)). "The party requesting a mistrial has the burden of demonstrating the requisite 'probability of prejudice.'" *Pollino v. Commonwealth*, 42 Va. App. 243, 248 (2004) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 429-30 (2003)).

"Generally, a trial court may cure errors arising from inadmissible evidence being improperly presented by promptly instructing the jury to disregard the inadmissible evidence." *Mills*, 24 Va. App. at 420. And "[j]uries are presumed to follow prompt, explicit, curative

instructions from the trial judge." *Id.*; *see Prieto v. Commonwealth*, 283 Va. 149, 169 (2012); *LeVasseur v. Commonwealth*, 225 Va. 564, 589 (1983) ("Unless the record shows the contrary, it is to be presumed that the jury followed an explicit cautionary instruction promptly given."). "Whether a manifest probability exists that the improper evidence prejudiced the accused despite the cautionary instruction depends upon the nature of the incompetent evidence when considered in relation to the nature of the charges, the other evidence in the case, and manner in which the prejudicial evidence was presented." *Mills*, 24 Va. App. at 420-21.

In his assignment of error, Goodman contends that the circuit court erred in denying his motion for a mistrial because "the Commonwealth's presentation of evidence impermissibly placed a burden on [him] to produce evidence." Goodman asserts that by Townley testifying that he could have sent items to the laboratory for forensic testing, presumably the untested pants, the jury could "blame the lack of testing of these items on the defendant, and not hold the Commonwealth to the burden of producing that evidence."

"Before determining whether the failure to declare a mistrial was prejudicial error, we must decide if there was any error in the first place." *Pollino*, 42 Va. App. at 249. We find no basis to conclude that Townley's answer effectively shifted the burden of proof to Goodman. Townley's statement simply related that a defendant could, following certain procedures, obtain testing of evidence through DFS. The forensic testing in this case concluded that Goodman's DNA was on K.P.'s lips and dentures, and the Commonwealth's questions tended to underscore that this finding was from a neutral, independent laboratory, not an arm of the Commonwealth. Thus, the question and answer permissibly supported the credibility of Townley's testimony and findings in her analysis.

In addition, the police detective explained that the PERK was sent to the laboratory for testing first; that testing revealed DNA evidence linking Goodman to the crime and rendering

testing of the pants unnecessary. There was no reason that the jury would or could impute the failure to test the pants to Goodman in a manner shifting the burden of producing evidence to him. And this Court has found that the "failure or neglect of an accused to produce evidence within his power might be considered by the jury in connection with the other facts proved in the case." *Id.* at 251 (quoting *Robinson v. Commonwealth*, 165 Va. 876, 880 (1936)). The record supports the circuit court's conclusion that there was no error, much less a prejudicial error requiring a mistrial.

In any event, after the exchange with Townley, the circuit court reminded the jury of the instruction from the trial's beginning that Goodman had no burden to produce evidence. All of the jurors agreed. The record thus fails to demonstrate that the jurors did not abide by a cautionary instruction that was timely given. We find no abuse of discretion by the circuit court.

II. Sufficiency of the Evidence

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction,

- 8 -

'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Goodman challenges the sufficiency of the evidence to sustain his conviction for forcible sodomy. Under Code § 18.2-67.1(A)(2), "[a]n accused shall be guilty of forcible sodomy if he . . . causes a complaining witness" to engage in fellatio "against the will of the complaining witness, by force, threat or intimidation."

To begin, we note that Goodman reads much into the jury's decision to acquit him of robbery, abduction, and three counts of using a firearm in the commission of a felony and infers that the jury necessarily rejected K.P.'s testimony as incredible. We find this inference unfounded. We have long held that where a jury renders apparently inconsistent verdicts, "a search of the trial record in an attempt to reconcile such inconsistency is neither appropriate nor required." *Akers v. Commonwealth*, 31 Va. App. 521, 529 (2000) (quoting *Wolfe v. Commonwealth*, 6 Va. App. 640, 650 (1988)). "[B]ecause Virginia is 'more careful than most states to protect the inviolability and secrecy of jurors' deliberations,' a court, in a case like this, is unlikely to discover what motivated the jury." *Gaines v. Commonwealth*, 39 Va. App. 562, 570 (2003) (en banc) (quoting *Reed v. Commonwealth*, 239 Va. 594, 598 (1990)). "Hence, we have recognized that '[j]ury verdicts may appear inconsistent because the jury has elected through mistake, compromise, or lenity to acquit or to convict of a lesser offense for one charged crime that seems in conflict with the verdict for another charged offense.'" *Barnes v. Commonwealth*, 80 Va. App. 588, 596-97 (2024) (alteration in original) (quoting *Kovalaske v. Commonwealth*, 56 Va. App. 224, 233 (2010)).

Goodman asserts that the Commonwealth failed to disprove that K.P. had engaged in prostitution or that Goodman's DNA was transferred to her through a previous sexual act with K.P. But "[w]hether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong." *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004) (quoting *Archer v. Commonwealth*, 26 Va. App. 1, 12-13 (1997)). "Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004) (alteration in original) (quoting *Miles v. Commonwealth*, 205 Va. 462, 467 (1964)).

In conducting our analysis of the sufficiency of the evidence, we are mindful that determining witness credibility "is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). The fact finder "[i]s free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc); *see Rollston v. Commonwealth*, 11 Va. App. 535, 547 (1991). When the trier of fact has resolved credibility issues in favor of the Commonwealth, "those findings will not be disturbed on appeal unless plainly wrong." *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)).

"Potential inconsistencies in testimony are resolved by the fact finder. We do not revisit such conflicts on appeal 'unless "the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but one conclusion."'" *Id.* at 292 (quoting *Molina v. Commonwealth*, 47 Va. App. 338, 369, *aff'd*, 272 Va. 666 (2006)).

"[T]he mere fact that a witness'[s] testimony may have been impeached does not necessarily render the testimony inherently incredible." *Ray v. Commonwealth*, 74 Va. App. 291, 306 (2022). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Whatever inconsistencies Goodman finds in her testimony, K.P.'s account of the sodomy itself was consistent. K.P. testified that two men shoved her inside her dark storage unit and held her at gunpoint there. One of the men asked K.P. if she wanted to have sex, and she refused. He then pulled out his penis and pressed it against her mouth. Though she tried to prevent it, he forced his penis into her mouth and made her suck it. He ejaculated on K.P.'s face and shirt. The police found K.P., distressed and crying, in the secured storage unit. Goodman's DNA was a match for the DNA found in the area of K.P.'s mouth, with the probability that someone else had a matching profile greater than 1 in 7.2 billion. From these facts and circumstances, a reasonable finder of fact could conclude beyond a reasonable doubt that Goodman forced K.P. to commit fellatio against her will and that he was guilty of forcible sodomy.

CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*