COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present: Judges Beales, Causey and Senior Judge Petty
Argued by videoconference


WILLIAM WINN KHINE

OPINION BY
v.      Record No. 1351-23-1          JUDGE RANDOLPH A. BEALES
                                      NOVEMBER 12, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Rufus A. Banks, Jr., Judge

Catherine French Zagurskie, Chief Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

David A. Mick, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


The Circuit Court of the City of Chesapeake convicted William Winn Khine of first-

degree murder for killing his wife, Khin Thuza Shwe, in violation of Code §§ 18.2-32 and

18.2-10. Khine appealed his conviction to this Court, and we found in a published opinion that

"the trial court erred in striking Khine's insanity defense because it failed to view the evidence in

the light most favorable to Khine." *Khine v. Commonwealth*, 75 Va. App. 435, 441 (2022).

Concluding that Khine had "met his burden of *production* on his affirmative defense," we

remanded the case for the trial court to determine "whether Khine carried his burden of

*persuasion* to prove by a preponderance of the evidence that Khine was totally deprived of the

ability to resist the voices that he claims commanded him to kill his wife." *Id.* at 441-42

(emphases added). On remand, the trial court found that Khine "did not carry his burden" of

persuasion, and it convicted him of first-degree murder. On appeal, Khine now challenges the

trial court's denial of his motion to reopen the evidence, as well as the trial court's finding that

he did not carry his burden of persuasion for his insanity defense. He also argues that the trial court erred by not considering all of the psychological evaluations and opinions at his sentencing.

## I. BACKGROUND[1]

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

### A. The Murder

James Kyaw testified at trial that on March 10, 2017, he received a phone call from Khine asking him for employee recommendations for Khine's sushi business. Conversing in both English and Burmese, Kyaw asked Khine why he needed a new employee. In response, Khine "said that he lost his employee. His employee is dead." When Kyaw asked Khine how his employee had died, Khine "said it was his wife," and "he said he killed her." Kyaw then recalled, "I told him, Don't call me. You are supposed to call police. If you don't call, I'm going to call, and then we hung up." Kyaw did not call the police, and he did not remember whether Khine had ever mentioned anything about hearing voices. Kyaw noted that Khine did not sound upset when they spoke on the phone, saying, "Just he's still talking about the business

---

[1] The record in this case was partially sealed. "To the extent that this opinion mentions facts found in the sealed record, only those specific facts have been unsealed because they are relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Eckard v. Commonwealth*, ___ Va. ___, ___ n.1 (Aug. 1, 2024).

about looking for employees to replace somebody, and then he said how to run his business. That's all he said."

Cell phone records showed that Khine called 911 shortly after his phone call with Kyaw. Khine told the 911 operator, "I think my wife is dying." He then stated, "I'm going crazy. I don't know why. Someone trying to push me to kill." When the 911 operator asked Khine who was trying to push him to kill his wife, Khine replied, "Somebody in my mind." The 911 operator then asked Khine if he was hearing voices, to which Khine responded, "Yes." When asked if he had ever heard voices before, Khine replied, "No, no, no, no, no, never happen. This is the first time." Khine explained that he had started hearing voices that same morning, and he claimed that the voices were telling him to hurt his wife. He noted that he and his wife had been arguing earlier that day before "someone pushing me to kill her, kill her, and then I squeeze her neck." He admitted to choking his wife to death, but he claimed, "I couldn't help — someone is pushing me. I don't know why."

Sergeant Shamber Lee Garrett of the Chesapeake Police Department testified that on March 10, 2017, she responded to Khine's apartment while he was still on the phone with the 911 operator. Sergeant Garrett recalled, "I was advised that the caller was hearing voices and that his wife was dying. I was under the impression that it was a mental-health call for service." She told the 911 operator to tell Khine to step outside of his apartment so the police could talk to him in the breezeway. She stated that Khine "came out with both of his hands up, one hand with the phone still on dispatch, and I told him he was okay to come out to me." She recounted that Khine then "advised that they were controlling his mind, that the voices told him to strangle his wife. I asked if he heard voices now. He stated, No. I asked him what he did, and he said, I strangled her." Sergeant Garrett further recounted, "I asked him again if he was hearing the voices now, and he stated, No. I asked him if he had ever heard voices before, and he stated, No,

- 3 -

just this time. I asked him if he took any medication, and he stated, No." She testified that she and several other officers then went inside Khine's apartment, where they found his wife's body on the living room floor. Sergeant Garrett placed Khine in handcuffs before he was then transported to Chesapeake police headquarters.

Detective Anthony Torres of the Chesapeake Police Department testified that he interviewed Khine at the Chesapeake police headquarters, where Khine signed a *Miranda* waiver form.[2] The interview was recorded. Khine told Detective Torres that he and his wife had gone to work at Harris Teeter that morning to make sushi for their business. He claimed that while he was working, "somebody controlling me in my mind." Khine stated that an hour or so later, he and his wife went back to their apartment, where a voice in his head told him to kill his wife. Khine stated that while his wife was lying down on the floor, he put both of his hands around her neck and began choking her for several minutes. He then used pajama pants to choke her again, and she begged him not to kill her. After choking his wife for several more minutes, Khine propped her up against the couch and went back to work for an hour before later returning to the apartment to find that his wife was still alive. Khine claimed that he then tried to set his wife down on the floor, but he heard a crack in her neck, and she stopped breathing.

Khine told Detective Torres that he then called two people. He first called his wife's cousin and asked him for the phone number of a sushi business associate. Khine next called the sushi business associate and told him that his wife was dying. The sushi business associate told Khine to call 911, and he assured Khine that he would take care of Khine's sushi business and Khine's son. Khine stated that he then called 911. Khine maintained that the murder was the first time he had heard voices, and he said that the voices stopped once he stopped choking his wife. Detective Torres testified that after conducting the interview, he went to Khine's

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

apartment, where other officers and the forensics unit were present. Detective Torres noted that Khine's "description of the positioning of the body was consistent with the way the body was found."

### B. Khine's Psychological Evaluations

Khine was charged with first-degree murder, and he was held without bail. On May 9, 2017, the Juvenile and Domestic Relations District Court for the City of Chesapeake ordered an evaluation to determine Khine's competency to stand trial and his sanity at the time of the offense. Dr. Weare A. Zwemer, a licensed clinical psychologist, evaluated Khine on June 20, 2017, and again on June 29, 2017. After evaluating Khine, Dr. Zwemer determined:

> Not only did Mr. Khine evidence gaps in his legal understanding, but he also reported auditory hallucinations at the time of the alleged offense and since. This writer would note that the precipitate emergence of psychotic symptoms at age 38 is consistent with no common psychiatric pattern. However, the defendant's struggle with abstract verbal reasoning and the consistency of his report to this writer and prior professional weighs toward his credibility. The present examiner cannot rule out conscious malingering, but he did not observe obvious indicators of it.

Dr. Zwemer then concluded, "In the present examiner's opinion, to a reasonable degree of clinical certainty, William Winn Khine does not possess a rational or factual understanding of his legal circumstance or the ability to effectively cooperate in the preparation of a defense."

On July 19, 2017, the juvenile court adjudicated Khine incompetent to stand trial, and it ordered that Khine be treated at Central State Hospital to restore his competency. Dr. Ted B. Simpson, a licensed clinical psychologist, evaluated Khine's competency to stand trial on August 7, 2017, and again on November 1, 2017. In his report dated November 6, 2017, Dr. Simpson noted that when Khine was admitted to the hospital, "he explained that he heard voices which seemed to be a man's voice but who could disguise himself as a woman, who currently commented on his living activities." Dr. Simpson opined:

- 5 -

> Mr. Khine did not spontaneously mention the auditory
> hallucinations he has reported to others until the undersigned asked
> him about this. He reported that he has heard a voice for some
> time and described a voice, usually male, which comments on
> events during his day. He stated that he was experiencing this
> voice during the interview. He never appeared to be responding as
> if to internal stimuli; he never appeared distracted, never lost track
> of the demanding interview process and never spoke or laughed as
> if speaking or responding to the unseen. Any auditory
> hallucinations symptoms he may experience do not appear to
> negatively impact his competency to stand trial.

Dr. Simpson then concluded, "It is therefore my opinion, to a reasonable degree of professional certainty, that the defendant, Mr. William Khine, currently meets the criteria for competence to stand trial."

On July 3, 2018, a Chesapeake grand jury indicted Khine for first-degree murder. On July 13, 2018, the Circuit Court of the City of Chesapeake ordered Dr. Zwemer to conduct an evaluation to determine Khine's mental state and his sanity at the time of the offense.

Dr. Zwemer asked the trial court to appoint a different examiner, stating:

> In the course of my assessment, William Khine has consistently
> reported symptoms of mental illness, which would have immediate
> relevance to the commission of this crime. Yet, without any
> independent information about his former life, I have been unable
> to construct a coherent narrative supporting or disconfirming a
> state of insanity.

The trial court instead ordered Dr. Ann Vanskiver, a licensed clinical psychologist, to evaluate Khine to determine his mental state and his mental condition at the time of the offense. The trial court also ordered Dr. Evan S. Nelson, a licensed clinical psychologist, to evaluate Khine's competency to stand trial.

Dr. Nelson evaluated Khine's competency to stand trial on May 6, 2019. In his report dated May 22, 2019, Dr. Nelson opined, "As of May 2019, Mr. Khine reported auditory hallucinations; those may be his entirely real subjective experience, but they were not impinging on his ability to communicate rationally and behave appropriately. If he was hallucinating, it

was a low grade of psychosis." He then concluded, "Based upon the available data, it is the opinion of the undersigned to a reasonable degree of psychological certainty that the defendant possessed a rational and adequately factual understanding of a trial and the roles of courtroom personnel and possessed the capacity to assist counsel in preparing a defense."

Dr. Vanskiver evaluated Khine's mental status at the time of the offense on January 7, 2019, on January 16, 2019, and on June 25, 2019. In her report dated August 2, 2019, Dr. Vanskiver acknowledged Dr. Nelson's prior report that "there was no clinically observable sign [of the voices]. Mr. Khine's behavior never suggested he had irrational ideas or was responding to hallucinations. They were not interfering with his ability to communicate logically about his past and his trial." (Alteration in original). Dr. Vanskiver noted that Khine had told her "that he began hearing voices approximately 5 days prior to the offense," contrary to what he had told the 911 operator and the police on the day of the murder. Khine also reported to Dr. Vanskiver that "he and his wife struggled with a great deal of stress," and he "described in detail the strain that the family was under due to his wife's concern of being sent back to Burma, and the pressure her family was putting on her to return." In addition, Khine shared with Dr. Vanskiver his fear that his wife would take their son if she had to return to Burma. Khine reiterated that he and his wife often argued, and he stated that his wife indicated that she would rather die than return to Burma.

Dr. Vanskiver's report also contained Khine's version of events that, on the morning of the murder:

> I guess I was speaking out loud to the voice, my wife was able to hear me chatting to the voice. She kept saying don't give it [the sushi business] to him and I told my wife she must listen to me she must listen to me or I will kill her. She said not to kill her. We were in the apartment by then.

- 7 -

When Dr. Vanskiver asked Khine whether he knew it was wrong to choke his wife, Khine replied, "I don't feel anything, so upset and angry, upset and angry at my wife for not listening to me. I couldn't hear the voice." When asked whether he felt in control of his body during the murder, Khine stated, "Yes." Dr. Vanskiver then asked Khine, "What if you hadn't listened to the voice what would have happened?" Khine responded, "If I did not listen to the voice nothing would have happened." Dr. Vanskiver then queried, "If the voices weren't there would you still have killed her?" Khine exclaimed, "No! No, because the voice controller had told me kill her if she don't listen to me. It's not like that, oh, I did not feel like ignoring the voice. Everything was complicated I was angry, the pressure." She then inquired, "What would cause you to do it? The voice controller or the anger?" Khine answered, "I don't know!"

In her report, Dr. Vanskiver opined that Khine "met the criteria for a threshold condition of a major mental illness, most likely a mood disorder of such severity that it resulted in psychotic features." She further opined, "It is likely based on the available information that Mr. Khine did struggle with acutely paranoid and possibly delusional beliefs at the time of the offense." She went on to state that

> at the time of the offense, Mr. Khine was responding to delusional thoughts and auditory hallucinations, resulting in his actions. That is, he was unable to rationally think through the reality of the situation, and assaulted his wife, following the directives of the voices he was hearing. Though he understood that his actions were wrong based on his report, and he understood that the consequences of his actions would result in his wife's death, he also believed that the nature of the voice controller was that he needed to follow it's [*sic*] commands.

She concluded that

> based on the interviews with Mr. Khine and the collateral information provided, it is this evaluator's opinion that Mr. Khine was indeed suffering from the symptoms consistent with an acute episode of psychosis at the time of the alleged offense. Additionally, based on the available information, there is evidence

to suggest that he was experiencing symptoms to the extent of impairing his ability to resist the impulse to commit the offense.

The trial court also ordered Dr. Thomas Sugden, a licensed clinical psychologist, to evaluate Khine's mental state at the time of the offense, which he did on October 16, 2019.[3] In his report dated October 21, 2019, Dr. Sugden wrote that Khine "reported that he was under tremendous pressure at work and had been frequently arguing with his wife," including an argument the day before the murder about his wife "going back to Burma and taking their son with her." Khine also reported to Dr. Sugden that "he was so angry and that his wife was not listening to him." According to Dr. Sugden's report, Khine "denied thinking about killing his wife prior to the day of the offense," and he "also denied ever hitting his wife." Khine "added that his wife told him that she wanted to die and that triggered him to do it." Dr. Sugden noted that Khine "was also asked if he didn't do what the voices told him to do what would happen and he stated, 'nothing will happen.'" Dr. Sugden went on to opine, "I agree with Dr. Vanskiver that Mr. Khine experienced a mood disorder with psychosis at the time of the offense. It appears that Mr. Khine broke from reality in a brief instance, which caused him to strangle his wife." Citing to Dr. Vanskiver's report, Dr. Sugden determined that "Mr. Khine meets the predicate for the legal test of insanity in that he has a serious mental disease or defect." Dr. Sugden concluded:

> In my professional clinical opinion, within a reasonable degree of psychological certainty, I agree with Dr. Vanskiver's opinion that Mr. Khine was unable to resist the impulse to commit the act and was insane at the time of the offense. It is therefore recommended that he be remanded for commitment at a state psychiatric hospital for evaluation and treatment.

---

[3] Although Dr. Sugden's report was filed with the trial court on October 23, 2019, and was referenced by the attorney for the Commonwealth and by the trial judge at two separate pretrial hearings, the report was not actually admitted into evidence as an exhibit at trial. In addition, although the parties stipulated that Dr. Sugden "is an expert qualified to testify as to the Defendant's mental status at the time of offense," Dr. Sugden did not testify at trial.

## C.  The Bench Trial

At Khine's bench trial, the Commonwealth introduced the autopsy report of Khine's wife, which provided, "This 39-year-old woman was found dead in her bedroom.  Autopsy findings were consistent with both application of an assailant's hand to the upper neck and jaw, and with soft ligature strangulation.  The manner was deemed homicide."  Dr. Wendy Gunther, who performed the autopsy, testified, "On the upper central neck below the chin, there were bruises with marks consistent with a hand.  On the upper left side of the neck, there were ligature marks."  Dr. Gunther noted, "Two of these marks diverged to form a narrow Y shape on the left side of the neck."  She explained that such marks "can happen when one ligature divides into two pieces or when two ends of one ligature are wrapped around and crossed."  The marks were consistent with her findings that Khine's wife had been strangled with hands and a ligature.  Addressing how long it takes to strangle a person to death, Dr. Gunther testified:

> The amount of time varies.  Most people who die from strangling die from interruption of the blood flow to the brain not from interruption of air flow to the lungs.  If strangling is performed with great strength so that the carotid arteries in the neck send no blood to the brain, the person can be unconscious in as little as a few seconds and dead in as little as a couple minutes.  If the person is not strangled with such great strength, then it may take several minutes.  No one knows exactly how many minutes.

However, she clarified, "If the person comes back to consciousness, the clock restarts with regard to how long it takes to die."

Dr. Gunther further testified that she found bruises on the arms of Khine's wife that were "consistent with control by another person" and were "consistent with another person gripping the decedent's arms to control her."  She opined, "The bruises could not have been occurred [*sic*] after death."  In addition, Dr. Gunther noted, "The right side of the upper eyelid of the right eye was swollen.  This does not happen from strangling.  This was from blunt trauma or impact of the eyelid."  She further noted, "I also saw faint swelling next to the right corner of the mouth.

This was also not a finding I would expect from strangulation, and I believe was from an impact to the side of the mouth." Based upon her observations, Dr. Gunther determined:

> The faint swelling next to the right corner of the mouth probably occurred close to the time of death because there was not time for it to swell up and discolor. The swollen area of the right upper eyelid is more difficult. It was purple, but that whole part of the face was purple. It could have occurred close to death or a few minutes earlier.

Dr. Gunther also pointed out that "[t]he neck was not broken" and that "the spine looks the same from both sides and had no injury." She found "no scrimmage injuries of the knuckles or defensive injuries of the hands."

The defense presented expert testimony from Dr. Vanskiver. Dr. Vanskiver testified that Khine's responses to her evaluation questions were "consistent with an individual who had experienced true difficulty with reality testing or psychosis." When asked which of Khine's symptoms were clinically significant, she replied:

> There were several, but the most notable were the auditory hallucinations or as Mr. Khine referred to it as the voice controller. His experience with the voice controller as seeing things that he sees as if through his eyes. His experience with tactile or feeling pressure on his hands. His experience with experiencing the voice controller as if it's a separate entity from himself as in not a thought, and additionally, he mentions stress a great deal, a great deal of stress. He felt other tactile experiences such as feeling electricity within his body. He felt pressure. He felt mad. He felt scared. All of those symptoms combined.

Based upon Khine's "flat affect" during the evaluations, his "disorganized thinking" at times, his self-reported experiences with "auditory hallucinations," and his "cultural beliefs around mental health," Dr. Vanskiver opined, "It was my conclusion that he was struggling with psychosis."[4]

---

[4] When asked on cross-examination whether she had administered any tests to determine whether Khine was malingering (i.e., overstating or faking his symptoms), Dr. Vanskiver acknowledged, "All of the tests for malingering are heavily relying on language, so they were not heavily relied upon." She also acknowledged that based on the American Psychiatric Association's Diagnostic and Statistical Manual, Khine had met two of the four malingering

She further concluded that Khine's "actions were a result of having difficulty understanding reality, distinguishing it from wrong as a result of acute mental-health symptoms that he was experiencing at the time of the offense."

After the defense rested, the Commonwealth moved the trial court to find as a matter of law that Khine had failed to prove that he was insane at the time of the murder. The trial court took the Commonwealth's motion under advisement, and the Commonwealth presented two rebuttal witnesses. Khine's neighbor, Crystal Rosario, testified that she never saw Khine talking to himself or acting as if he was speaking to somebody else who was not present. Rebecca Simonton, an employee at the same Harris Teeter where Khine and his wife ran their sushi business, testified that Khine's wife had told her that "she was going to ask William or tell him she wanted a divorce." Simonton recalled seeing Khine and his wife arguing at the Harris Teeter the day before the murder.

After the parties presented their closing arguments, the trial court granted the Commonwealth's motion to find that Khine had failed to establish his insanity defense. The trial court found that although Dr. Vanskiver

> noted that he [Khine] was responding to delusional thoughts and auditory hallucinations, she did not address his inability to control his actions or restrain himself. Her further observation that this defendant needed to follow the commands of the voice controller fails also to address whether that need left him powerless to control himself.

The trial court further found that

> [t]he fact that Dr. Vanskiver opined that the defendant was experiencing symptoms to the extent of impairing his ability to resist the impulse to commit the offenses as well as her testimony in court establishes that the defendant's ability was diminished,

---

factors and that "malingering should be strongly suspected if any combination is noted." However, she maintained that she "engaged in lines of questioning that are very common to try to flush out malingering as possible standardized measures," and she stated that she did not believe that Khine was malingering.

using the definition of "impaired" as opposed to the legal requirement that his mental power to control or restrain himself be entirely taken away or that he was totally deprived of that power.

Giving "great weight to the testimony and written evaluation of the defendant by Dr. Vanskiver," the trial court determined that Khine had "failed to meet his burden as a matter of law," and it concluded that "the affirmative defense of insanity by reason of an irresistible impulse has not been established."

The trial court subsequently convicted Khine of first-degree murder. At the sentencing hearing, Khine's trial counsel asked the trial court "to consider the reports that have been submitted as evidence," and she emphasized that Dr. Vanskiver's findings "should be taken as mitigating evidence." During allocution, Khine stated, "For what happened to Khin Shwe, I'm very sorry about that. Khin Shwe has died. My son Henry had to go to Burma, and also I ended up in jail, and all of these things it happened because of me, and that is all." The circuit court sentenced Khine to 45 years of incarceration with 15 years suspended. Khine appealed to this Court.

### D. Khine's First Appeal to this Court

On appeal, Khine argued that the trial court erred in admitting Simonton's hearsay testimony, that it erred in striking his insanity defense, and that the evidence was insufficient to convict him of first-degree murder. *Khine*, 75 Va. App. at 444. We found that Simonton's hearsay testimony was admissible under the *Hillman* doctrine, *Mut. Life Ins. Co. v. Hillman*, 145 U.S. 285, 295-96 (1892), which the Supreme Court of Virginia adopted in *Hodges v. Commonwealth*, 272 Va. 418, 442 (2006). *Khine*, 75 Va. App. at 446. We also found that the trial court "set forth the correct legal standard for a defendant to prove an irresistible-impulse insanity defense." *Id.* at 449. However, we held that the trial court erred in granting the Commonwealth's motion to strike his insanity defense "because it failed to consider the evidence

- 13 -

in the 'light most favorable' to Khine, the non-moving party." *Id.* at 450. We concluded that Khine satisfied his burden of production because "the evidence from Dr. Vanskiver supported Khine's affirmative defense that he was totally unable to resist the voice in his head that commanded him to kill his wife." *Id.* at 451.

In addressing the appropriate appellate remedy, we recognized that "[b]ecause the Commonwealth moved to strike Khine's affirmative defense during its closing argument, *all* the evidence had been presented. The only question was how the trial court, sitting as the factfinder, should weigh the evidence." *Id.* at 452 (emphasis in original). Relying on analogous circumstances in other cases, we noted that when a trial court applies an incorrect legal standard, "the proper appellate response is to vacate the convictions and remand the case to the trial court with instructions." *Id.* (quoting *Edwards v. Commonwealth*, 49 Va. App. 727, 742 (2007), and citing *Orndorff v. Commonwealth*, 271 Va. 486, 505 (2006)). Consequently, we remanded the case to the trial court to "determine whether Khine carried his burden of persuasion to prove by a preponderance of the evidence that he acted under an irresistible impulse to kill his wife."[5] *Id.* In doing so, we pointed out that "[a]lthough Khine requests and prefers a new trial, his counsel agreed at oral argument that it would not be error to remand the case to the trial court to determine whether Khine satisfied his burden of persuasion." *Id.*

E. This Court's Remand to the Trial Court

On remand, Khine's trial counsel moved the trial court to reopen the evidence to permit Khine to present Dr. Sugden's report to support his insanity defense. The Commonwealth opposed Khine's motion, arguing that "if the Court were to reopen the case, when it comes to rebuttal witnesses, there is potential prejudice" to the Commonwealth. Khine's trial counsel also

---

[5] Given our holding on appeal and our instructions to the trial court on remand, we found that Khine's sufficiency argument in his third assignment of error was moot. *Khine*, 75 Va. App. at 452 n.3.

moved the trial court to find Khine not guilty by reason of insanity, asserting that he acted under an irresistible impulse. At the remand hearing, the trial court denied both of Khine's motions, stating:

> The question presented to this Court on remand from the Court of Appeals of Virginia is whether the Defendant carried his burden of persuasion to prove by a preponderance of the evidence that he acted under an irresistible impulse to kill his wife. The Court finds that he did not carry his burden.

Khine's trial counsel then asked the trial court to reconsider its ruling, and the trial court denied that motion to reconsider.

The Commonwealth filed a "Motion for Entry of Conviction and Sentencing Orders," seeking "orders reinstating the conviction and sentence previously imposed." The attorney for the Commonwealth argued that because the trial court "denied defense's motion to reopen the evidence, there's no new evidence that has been presented to the Court that would result in a change to the original conviction and sentence." In response, Khine's trial counsel asked the trial court "to consider all prior psychiatric evaluations in this case," including Dr. Sugden's report, "for mitigation purposes in resentencing Mr. Khine." Khine's trial counsel also asked the trial court "to incorporate all of the arguments made by the defense at the last hearing in this matter," and counsel reiterated that the trial court should consider all of Khine's prior psychiatric evaluations "for sentencing purposes, and that is a different issue than reopening the trial evidence in this matter." In addition, Khine's trial counsel urged the trial court "to note that all medical professionals who evaluated Mr. Khine in this matter were in agreement that at the time of the commission of this offense he was not guilty by reason of insanity." The attorney for the Commonwealth objected to Khine's requests, stating, "The Court of Appeals directed . . . that this case was remanded for the Court to apply the proper application of the correct standard. The

- 15 -

Court having done that, it is appropriate that orders consistent with the Court's original findings be entered."

The trial court sustained the Commonwealth's objection. By final order entered on August 8, 2023, the trial court again convicted Khine of first-degree murder, and it again sentenced him to 45 years of incarceration, with 15 years suspended.[6] The trial court pronounced Khine's sentence

> after having fully considered all of the evidence adduced at trial in this case and making findings on that evidence in addition to reviewing the applicable sentencing guidelines, which were made part of the record, hearing the defendant's allocution and the arguments of counsel at the defendant's sentencing on August 21, 2021, and after having made its findings on the questions presented to this Court on the remand and given the impact of that finding on the balance of these proceedings including the motion and arguments made before this Court today by both the Commonwealth and the defense and also finding it unnecessary to revisit those matters in any greater detail beyond consideration of them and once more having made rulings on the issues presented to this Court on April 14, 2023.

Khine now appeals this decision to this Court.

---

[6] The trial court's final sentencing order for Khine states, "After hearing evidence and argument of counsel, the Court granted the *defendant's* motion for re-entry of the previous conviction and sentencing orders, for the reasons stated on the record." (Emphasis added). However, it was actually the *Commonwealth's* motion, not Khine's motion. "Clerical mistakes in all judgments or other parts of the record and errors therein arising from oversight or from an inadvertent omission may be corrected by the court at any time on its own initiative or upon the motion of any party and after such notice, as the court may order." Code § 8.01-428(B). "Scrivener's or similar errors in the record, which are demonstrably contradicted by all other documents, are clerical mistakes." *Wellmore Coal Corp. v. Harman Mining Corp.*, 264 Va. 279, 283 (2002) (quoting *Zhou v. Zhou*, 38 Va. App. 126, 133 (2002)). Given that the record before this Court on appeal is clear that the *Commonwealth* moved the trial court for entry of conviction and sentencing orders, we remand this matter to the trial court for the very limited purpose of correcting the clerical error in Khine's final sentencing order pursuant to Code § 8.01-428(B). *See Haefele v. Commonwealth*, 75 Va. App. 591, 606 n.7 (2022) (affirming a trial court's judgment and remanding to fix a scrivener's error in a sentencing order).

## II. ANALYSIS

### A. <u>Khine's Motion to Reopen</u>

On appeal, Khine first contends, "The trial court erred by denying Mr. Khine's Motion to Reopen." Khine argues that his "motion to reopen would have advanced the ends of justice by allowing the trial court to hear all evidence, including evidence of Dr. Sugden's opinion that Mr. Khine was insane at the time of the offense."

"Motions to reopen an evidentiary record or to reconsider a prior ruling involve matters wholly in the discretion of the trial court." *Thomas v. Commonwealth*, 62 Va. App. 104, 109 (2013); *see also Laughlin v. Rose*, 200 Va. 127, 129 (1958). "A litigant's 'right to relief on such rehearing depends upon his ability to point out some error on the face of the record, or to show some legal excuse for his failure to present his full defense at or before the time of entry of the decree which he seeks to have modified.'" *Thomas*, 62 Va. App. at 109 (quoting *Downing v. Huston, Darbee Co.*, 149 Va. 1, 9 (1927)). "Without valid excuse, no party who has had his day in court can reopen the hearing . . . on the mere ground that he wishes to interpose other defenses which he neglected to interpose before such decision was made." *Id.* at 109-10 (alteration in original) (quoting *Holmes v. Holmes*, 7 Va. App. 472, 482 (1988)).

> This "valid excuse" standard typically requires a showing that the party has exercised due diligence in making the best of prior opportunities to address the issue, has obtained newly-discovered evidence that could not have been previously discovered during a reasonably thorough investigation, or has recently learned of an unforeseeable judicial ruling affecting the issue previously decided by the court.

*Id.* at 110 (quoting *Holmes*, 7 Va. App. at 482). Whether a trial court should reopen an evidentiary record is "a matter we review under the highly deferential abuse-of-discretion standard." *Id.* at 111.

As noted *supra*, in Khine's first appeal to this Court, we held that the trial court "did err when it granted the Commonwealth's motion to strike Khine's insanity defense as a matter of law and failed to evaluate that defense on the merits." *Khine*, 75 Va. App. at 453. In so ruling, we found that "[b]ecause the Commonwealth moved to strike Khine's affirmative defense during its closing argument, *all* the evidence had been presented. The only question was how the trial court, sitting as the factfinder, should weigh the evidence." *Id.* at 452 (emphasis in original). We pointed out that "[a]lthough Khine requests and prefers a new trial, his counsel agreed at oral argument that it would not be error to remand the case to the trial court to determine whether Khine satisfied his burden of persuasion." *Id.* We vacated the conviction and ordered that "[o]n remand, the trial court should determine whether Khine carried his burden of persuasion to prove by a preponderance of the evidence that he acted under an irresistible impulse to kill his wife." *Id.* (footnote omitted).

Dr. Sugden evaluated Khine's mental state at the time of the offense on October 16, 2019, and his report was filed in the trial court on October 23, 2019. Although Dr. Sugden's report was not formally admitted into evidence at trial, the Commonwealth acknowledged the report at a pretrial hearing on December 18, 2019, and the trial court likewise acknowledged the report at another pretrial hearing on January 10, 2020 — when the trial court denied Khine's motion to quash the Commonwealth's subpoena *duces tecum* for Khine's medical records. In addition, the parties' "Stipulation of Facts and Evidence," which was admitted into evidence at trial as Commonwealth's Exhibit 1, even provided that "Dr. Thomas Sugden is an expert qualified to testify as to the Defendant's mental status at the time of the offense." However, Khine's trial counsel elected not to call Dr. Sugden as a witness to testify at trial. As we noted at Khine's first appeal, "*all* the evidence had been presented. The only question was how the trial court, sitting as the factfinder, should weigh the evidence." *Khine*, 75 Va. App. at 452 (emphasis

in original).  In short, because Dr. Sugden's report was known to the parties well before trial and because Khine's trial counsel elected not to call Dr. Sugden to testify at trial, Khine has not shown a valid reason or excuse on appeal for why the evidentiary record needed to be reopened. Therefore, the trial court did not abuse its discretion in denying Khine's motion to reopen the evidentiary record.

### B.  Khine's Insanity Defense

Khine next contends, "The trial court erred by finding that Mr. Khine did not carry his burden of persuasion to prove by a preponderance of the evidence that he acted under an irresistible impulse to kill his wife."  Khine argues that "[b]ased on the evidence presented by Dr. Vanskiver, Mr. Khine met the legal standard of irresistible impulse" because

> his mind placed him under a coercion that he was incapable of
> resisting — as shown, in part, by the voice controller pressing on
> his hand; his statement that he would not have killed his wife if not
> for the voices; and Dr. Vanskiver's testimony that the psychosis
> resulted in Mr. Khine's actions as he needed to follow the voice
> commands.

In Virginia, "insanity is an affirmative defense that the defendant must establish to the satisfaction of the fact finder." *Shifflett v. Commonwealth*, 221 Va. 760, 769 (1981).  "The defendant bears the burden of proving the defense by a preponderance of the evidence." *Brown v. Commonwealth*, 68 Va. App. 746, 795 (2018); *see also Taylor v. Commonwealth*, 208 Va. 316, 322 (1967) ("In Virginia, every man is presumed to be sane until the contrary is made to appear and when insanity is relied upon as a defense in a criminal prosecution, it must be proved by the defendant to the satisfaction of the [fact finder].  This does not shift the ultimate burden of proof which rests upon the Commonwealth to prove the commission of the alleged offense beyond a reasonable doubt.").  It is well established that "the accused must prove that his or her mental state met the appropriate legal definition of insanity 'at the time the offense was

- 19 -

committed.'" *Vann v. Commonwealth*, 35 Va. App. 304, 313 (2001) (quoting *Gibson v. Commonwealth*, 216 Va. 412, 417 (1975)).

"Virginia law recognizes two tests by which an accused can establish criminal insanity, the M'Naghten Rule and the irresistible impulse doctrine." *Id.* (quoting *Bennett v. Commonwealth*, 29 Va. App. 261, 277 (1999)). Relevant here, "[t]he irresistible impulse defense is available when the accused's mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act." *Id.* (quoting *Bennett*, 29 Va. App. at 277). The Supreme Court has previously defined "irresistible impulse" to be

> an impulse induced by, and growing out of some mental disease
> affecting the volitive, as distinguished from the perceptive, powers,
> so that the person afflicted, while able to understand the nature and
> consequences of the act charged against him and to perceive that it
> is wrong, is unable, because of such mental disease, to resist the
> impulse to do it. It is to be distinguished from mere passion or
> overwhelming emotion not growing out of, and connected with, a
> disease of the mind. Frenzy arising solely from the passion of
> anger and jealousy, regardless of how furious, is not insanity.

*Thompson v. Commonwealth*, 193 Va. 704, 717 (1952). We have recognized that "the word 'impulse' implies that which is sudden, spontaneous, unpremeditated." *Vann*, 35 Va. App. at 314 (quoting *Rollins v. Commonwealth*, 207 Va. 575, 580 (1966)). "Acting on an impulse involves no planning; it could occur at any place in the presence of anyone, and further, the lack of restraint inherent in an impulsive act is inconsistent with a contemporaneous concealment of the impulsive act." *Id.* (citing *Rollins*, 207 Va. at 580).

As noted *supra*, in Khine's first appeal to this Court, we found that the trial court "set forth the correct legal standard for a defendant to prove an irresistible-impulse insanity defense." *Khine*, 75 Va. App. at 449. We concluded, however, that "Khine met his burden of production on his affirmative defense." *Id.* at 441. We then ordered that, on remand, "the trial court should determine whether Khine carried his burden of persuasion to prove by a preponderance of the

evidence that he acted under an irresistible impulse to kill his wife."[7]  *Id.*  On remand, the trial court subsequently found:

> The question presented to this Court on remand from the Court of Appeals of Virginia is whether the Defendant carried his burden of persuasion to prove by a preponderance of the evidence that he acted under an irresistible impulse to kill his wife.  The Court finds that he did not carry his burden.

The record before this Court on appeal shows that Khine's own actions both leading up to and during the murder were "inconsistent with the notion of an individual having no mental power or control over his or her own conduct."  *Vann*, 35 Va. App. at 314.  During his recorded interview with the police, Khine told Detective Torres that he and his wife had gone to work together at Harris Teeter on the morning of the murder.  Khine said that while he was working, "somebody controlling me in my mind."  However, it was not until an hour or so later — once Khine and his wife had left the Harris Teeter and had returned to the private confines of their apartment — that Khine began choking his wife, first using only his bare hands, and then using pajama pants to choke her.  Khine later claimed that he had never hit his wife and that he had heard a crack in his wife's neck before she stopped breathing.   However, those claims were expressly contradicted by Dr. Gunther's expert testimony at trial that during her autopsy examination of the body of Khine's wife, she found bruises on her arms that were "consistent with control by another person" and that were "consistent with another person gripping the decedent's arms to control her."  Dr. Gunther also observed swelling on her face, which Dr. Gunther determined had resulted from "blunt trauma or impact" rather than strangulation.

---

[7] "The burden of persuasion 'is the obligation to introduce evidence that actually persuades the fact finder to the requisite degree of belief that a particular proposition of fact is true.'"  *White v. Llewellyn*, 299 Va. 658, 666 (2021) (quoting *Parson v. Miller*, 296 Va. 509, 525 (2018)).  "We have also referred to the burden of persuasion 'as the "risk of non-persuasion," because the party that bears the burden of persuasion must lose the case if the evidence leaves the factfinder in doubt.'"  *Id.* (quoting *Parson*, 296 Va. at 525).

Dr. Gunther further found that "[t]he neck was not broken" and that "the spine looks the same from both sides and had no injury."

In addition, Dr. Vanskiver stated in her report that when she asked Khine, "What if you hadn't listened to the voice what would have happened?", Khine candidly admitted, "If I did not listen to the voice *nothing would have happened*." (Emphasis added). When Dr. Vanskiver then asked Khine, "If the voices weren't there would you still have killed her?", Khine exclaimed, "No! No, because the voice controller had told me kill her if she don't listen to me." However, Khine then clarified, "It's not like that, oh, *I did not feel like ignoring the voice*. Everything was complicated *I was angry*, the pressure." (Emphases added). Dr. Vanskiver later asked Khine, "What would cause you to do it? The voice controller or the anger?" Khine answered, "I don't know!" Khine went on to describe to Dr. Vanskiver his arguments with his wife and the immense stress under which he and his wife were then living. He even told Dr. Vanskiver that he felt in control of his body during the murder and that when he was choking his wife, "I don't feel anything, so upset and angry, upset and angry at my wife for not listening to me. *I couldn't hear the voice*." (Emphasis added). Therefore, given Khine's own admissions to Dr. Vanskiver, we cannot say that he was "totally deprived of the mental power to control or restrain his act." *Vann*, 35 Va. App. at 313 (quoting *Bennett*, 29 Va. App. at 277).

Furthermore, at trial, Dr. Vanskiver testified that "a *person* might understand that an action is incorrect. They might understand that it results in death, but are experiencing auditory hallucinations that makes it impossible to resist them." (Emphasis added). But she did not explicitly testify that *Khine's* auditory hallucinations made it impossible for *him* to resist the voice in his head. Instead, she both stated in her report and opined at trial that "there is evidence to *suggest* that he was experiencing symptoms to the extent of *impairing* his ability to resist the impulse to commit the offense." (Emphases added). As we aptly noted in deciding Khine's first

appeal, "To be sure, there is some ambiguity and lack of forcefulness in Dr. Vanskiver's words. They could be narrowly construed to mean that Khine suffered *partial* impairment, or more liberally construed to mean a *total* impairment of Khine's ability to control his actions." *Id.* at 451 (emphases in original).

In short, Khine admitted to Dr. Vanskiver that if he had not listened to the voice in his head, nothing would have happened. He repeatedly stated that he felt very angry and upset with his wife, and he noted that he did not feel like ignoring the voice. Khine even acknowledged that he actually felt in control of his body while he was choking his wife to death. Furthermore, he stated that he stopped choking her long enough to go back to work when he realized it was time for him to return to work that morning at Harris Teeter. Therefore, for all these reasons, we cannot say that the trial court was plainly wrong or without credible evidence in finding that Khine failed to meet his burden of persuasion — or that the trial court erred in finding as a matter of law that Khine had not established the affirmative defense of insanity by reason of an irresistible impulse.

## C. Sentencing

Finally, Khine contends, "The trial court erred by sustaining the Commonwealth's objection and refusing to consider, at sentencing, all evaluations and opinions on mental status at the time of the offense, including Dr. Sugden's evaluation and opinion."

It is well settled that we apply the abuse of discretion standard of review to a trial court's sentencing decision. *Cellucci v. Commonwealth*, 77 Va. App. 36, 45 (2023) (*en banc*). "A trial court abuses its discretion by failing to consider a significant relevant factor, giving significant weight to an irrelevant or improper factor, committing a clear error of judgment, or making a mistake of law." *Id.* at 46. "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting

- 23 -

*Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).  "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie."  *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)).

"It is within the trial court's purview to weigh any mitigating factors presented by the defendant."  *Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000).  "Barring clear evidence to the contrary, this Court will not presume that a trial court purposefully ignored mitigating factors in blind pursuit of a harsh sentence."  *Bassett v. Commonwealth*, 13 Va. App. 580, 584 (1992).  "Absent a statutory requirement to do so, 'a trial court is not required to give findings of fact and conclusions of law.'"  *Bowman v. Commonwealth*, 290 Va. 492, 500 n.8 (2015) (quoting *Fitzgerald v. Commonwealth*, 223 Va. 615, 627 (1982)).

In this case, at the hearing on the Commonwealth's motion for entry of conviction and sentencing orders, the trial court sustained the Commonwealth's objection to Khine's request that the trial court "note that all medical professionals who evaluated Mr. Khine in this matter were in agreement that at the time of the commission of this offense he was not guilty by reason of insanity."  The trial court then convicted and sentenced Khine

> after having fully considered all of the evidence adduced at trial in this case and making findings on that evidence in addition to reviewing the applicable sentencing guidelines, which were made part of the record, hearing the defendant's allocution and the arguments of counsel at the defendant's sentencing on August 21, 2021, and after having made its findings on the questions presented to this Court on the remand and given the impact of that finding on the balance of these proceedings including the motion and arguments made before this Court today by both the Commonwealth and the defense and also finding it unnecessary to revisit those matters in any greater detail beyond consideration of them and once more having made rulings on the issues presented to this Court on April 14, 2023.

Although neither party formally moved to admit Dr. Sugden's report into evidence at trial, the report was filed with the trial court well before trial, and the trial court specifically stated that it considered "all of the evidence adduced at trial in this case" — which included the reports from Dr. Vanskiver, Dr. Nelson, Dr. Simpson, and Dr. Zwemer. Dr. Sugden's report largely relied upon the findings and observations contained in Dr. Vanskiver's report, and Dr. Sugden specifically stated in his report that he agreed with Dr. Vanskiver's opinion. Considering the record before this Court on appeal as a whole, there is no evidence that the trial court neglected to weigh Khine's mitigating evidence, nor is there evidence that the trial court failed to consider any significant relevant factor. Therefore, we cannot say that the trial court abused its broad discretion at sentencing.

## III.  CONCLUSION

The trial court did not abuse its discretion in denying Khine's motion to reopen the evidentiary record. The trial court also did not abuse its broad discretion at sentencing. In addition, the trial court was not plainly wrong or without credible evidence in finding that Khine failed to carry his burden of persuasion to establish the affirmative defense of insanity by reason of an irresistible impulse. Therefore, for all of the foregoing reasons, we affirm the trial court's judgment, and we do not disturb Khine's conviction. We remand this matter to the trial court for the very limited purpose of correcting the clerical error noted *supra* on the final sentencing order.

*Affirmed and remanded.*